UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 24-_____ _____     _____ Caption [use short title] _____

Motion for: Petition for Permission to Appeal

Under Fed. R. Civ. P. 23(f)

_____

_____

Set forth below precise, complete statement of relief sought:

Grant the petition for permission to appeal order denying

class certification under Fed. R. Civ. P. 23(f).

_____

In re: Kirkland Gold Ltd. Securities Litigation

_____

_____

_____

_____

| MOVING PARTY: Stephen Brahms | OPPOSING PARTY: Kirkland Lake Gold Ltd.; Anthony P. Makuch |
|---|---|
| ☑ Plaintiff   ☐ Defendant | |
| ☑ Appellant/Petitioner   ☐ Appellee/Respondent | |

MOVING ATTORNEY: Daniel Woofter          OPPOSING ATTORNEY: Audra J. Soloway; Joshua Hill Jr.

[name of attorney, with firm, address, phone number and e-mail]

Goldstein, Russell & Woofter LLC          Paul, Weiss, Rifkind, Wharton & Garrison LLP

1701 Pennsylvania Ave. NW, Suite 200, Washington, DC 20006     1285 Avenue of the Americas, New York, NY 10019

(202) 240-8433 dhwoofter@gmail.com     (212) 373-3289 asoloway@paulweiss.com; (628) 432-5123 jhill@paulweiss.com

Court- Judge/ Agency appealed from: The Honorable J. Paul Oetken, U.S. District Court for the Southern District of New York

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):_____
_____

Opposing counsel's position on motion:
☐ Unopposed   ☑ Opposed   ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes   ☐ No   ☐ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:

Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?   ☐ Yes ☐ No
Requested return date and explanation of emergency: _____
_____
_____
_____
_____

Is oral argument on motion requested?   ☑ Yes   ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No  If yes, enter date:_____

Signature of Moving Attorney:

_____ Date: April 12, 2024   Service by: ☐ CM/ECF   ☑ Other [Attach proof of service]

# No. 24-_____

## United States Court of Appeals for the Second Circuit

STEPHEN BRAHMS, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiff-Petitioner*,

v.

KIRKLAND LAKE GOLD LTD., ANTHONY P. MAKUCH,

*Defendants-Respondents*.

From an order denying certification of a class entered on March 29, 2024 by the U.S. District Court for the Southern District of New York (No. 1:20-cv-04953-JPO)
The Honorable J. Paul Oetken

## PLAINTIFF'S PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

Christian Levis
LOWEY DANNENBERG, P.C.
44 South Broadway
Suite 1100
White Plains, NY 10601
(914) 997-0500

Daniel Woofter
Kevin K. Russell
GOLDSTEIN, RUSSELL &
  WOOFTER LLC
1701 Pennsylvania Ave., NW
Suite 200
Washington, DC 20006
(202) 240-8433

*Counsel for Plaintiff-Petitioner*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ii

INTRODUCTION .......................................................................... 1

QUESTIONS PRESENTED .............................................................. 3

BACKGROUND ........................................................................... 4

   I.   FACTUAL BACKGROUND ................................................. 4

   II.  LEGAL BACKGROUND ................................................... 7

   III. PROCEDURAL HISTORY ................................................. 9

        A.   Motion to Dismiss ................................................. 9

        B.   Class Certification................................................ 11

STANDARD ............................................................................. 13

ARGUMENT ............................................................................ 14

   I.   THE DENIAL OF CERTIFICATION IMPLICATES LEGAL QUESTIONS
       ABOUT WHICH THERE IS A COMPELLING NEED FOR IMMEDIATE
       RESOLUTION. ............................................................ 14

        A.   The District Court Applied *Goldman IV*'s Considerable-
           Gap-in-Genericness Framework Despite Finding *No*
           Gap in Genericness Between the Minimum Standards
           Statement and the Corrective Disclosure. ............................ 14

        B.   The District Court Applied *Goldman IV*'s Mismatch
           Framework to the M&A Statements.................................... 16

   II.  FAILING TO GRANT THE PETITION WILL END THE CASE, AND THE
       DISTRICT COURT'S DECISION IS DEEPLY TROUBLING...................... 20

CONCLUSION ........................................................................ 28

i

# TABLE OF AUTHORITIES

## Cases

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) ....................................................25

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ..............................................8, 14, 16, 28

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ........... 1, 2, 3, 8, 12, 14, 15, 16, 17, 18, 22, 25

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ..........................................................7, 19

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
594 U.S. 113 (2021) ..........................2, 7, 8, 12, 15, 16, 17, 18

*In re NIO, Inc. Sec. Litig.*,
2023 WL 5048615 (E.D.N.Y Aug. 8, 2023) ..........................18

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993).......................................................10

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
262 F.3d 134 (2d Cir. 2001).................................13, 19, 20, 21

*West v. Prudential Sec., Inc.*,
282 F.3d 935 (7th Cir. 2002) ................................................20

## Rules

Fed. R. Civ. P. 23(b)(3) ..............................................................1

Fed. R. Civ. P. 23(f).................................................1, 13, 19, 20

ii

Plaintiff-Petitioner Stephen Brahms respectfully petitions under Fed. R. Civ. P. 23(f) to appeal from the March 29, 2024 Order of the U.S. District Court for the Southern District of New York (Oetken, J.) denying Plaintiff's motion to certify a class under Fed. R. Civ. P. 23(b)(3).

## INTRODUCTION

This is one of the first cases construing and applying the "mismatch framework" announced in *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 81 (2d Cir. 2023) ("*Goldman IV*"). Because this case raises several important questions about that framework that won't be reviewed at the end of the case, this court should grant leave to appeal now.

In *Goldman IV*, this Court provided "[g]uidance moving forward" for courts considering class certification in securities fraud class actions asserting inflation-maintenance claims. 77 F.4th at 102. Specifically, it established the rules for "a searching price impact analysis" to apply when there is a "considerable gap in ... genericness" between an alleged misrepresentation and the corrective disclosure. *Ibid.* The Court, however, provided limited guidance on what counts as a "generic" statement and what degree of mismatch is enough to invoke this

heightened review. And it provided no guidance on how courts should treat price impact claims after the Supreme Court's decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021) ("*Goldman*"), when the district court determines there is no considerable gap in genericness.

Here, the District Court acknowledged that some of the alleged misstatements were substantially more specific "than the Supreme Court's prototype" in *Goldman* or "the more platitudinous statements as issue" in *Goldman IV*. ADD15. But it concluded that *Goldman IV*'s heightened analysis was still required. *Ibid.* The District Court further concluded that even though there was no significant mismatch with respect to the other alleged misstatement, *Goldman IV* still empowered the court to decide whether the statement was false to determine whether there was a "*substantive* mismatch" between the statement and the corrective disclosure. ADD21-22 (emphasis added).

Both holdings raise serious, recurring questions of general importance that this Court should resolve now. Indeed, *Goldman IV* predicted that "whatever analytical approaches might be warranted in

the future remains to be seen," and that the Court would "have work to do" in providing guidance moving forward. 77 F.4th at 105.

## QUESTIONS PRESENTED

1.  When a court determines that there is no "considerable gap in genericness" between an alleged misstatement and corrective disclosure, may it nonetheless decide the merits question of whether the alleged misstatement was false (and in the process resolve disputed issues of fact a jury would otherwise decide) in the guise of determining whether there is a "substantive mismatch" between the statement and corrective disclosure?

2.  Were the "M&A Statements" in this case generic enough to invoke the "searching price impact analysis" framework announced in *Goldman IV*?

3.  Did the District Court err when, in the course of applying *Goldman IV*, it found "that the record does not support Plaintiff's initially pleaded theory that Kirkland was actively negotiating with Detour at the time of the three alleged misstatements," without acknowledging the record evidence showing that Kirkland was actively courting *other* poorly performing mines at the time?

3

# BACKGROUND

## I. FACTUAL BACKGROUND

In this securities fraud class action, Plaintiff Stephen Brahms alleges that Kirkland Lake Gold Ltd. and its former CEO, Anthony P. Makuch, misled investors about the minimum performance standards that any potential acquisition target would have to satisfy even though they knew that Kirkland was actively considering acquisitions that did *not* meet those metrics. When Defendants later announced a merger with a company that didn't meet those minimum standards, Kirkland's market price plunged, leading to this securities fraud class action.

Kirkland, a gold-mining and exploration company, has long distinguished itself from other mining companies by focusing on mines with high reserve grades that allowed it to produce gold much more efficiently than its competitors. Doc.25¶22. As analyst RBC Capital Markets recognized as far back as October 2017, Kirkland's low-cost/high quality production metrics were the reason its stock traded "at a meaningful premium" over its competitors and was a "core holding" for institutional investors. Doc.69-3, at 11. Analyst Canaccord Genuity Capital Markets reported on January 21, 2019—at the time of the alleged

4

misstatements—that Kirkland's "management would need to be selective" regarding any potential acquisition "in order to retain the premium multiple, by evaluating potential *high-grade and low-cost* operations," in other words, by targeting "a fully-derisked, low-cost producer" for acquisition. Doc.106-3, at 18 (emphasis added).

To maintain that premium, Defendants misled investors into believing that Kirkland was focused on organically growing its existing high-grade/low-cost mines and would not achieve growth through acquisitions unless a high-quality target met its minimum criteria for grade and cost.

Thus, at an "Investor Day" meeting on January 14, 2019, Makuch responded to an analyst's question *about Kirkland's acquisition strategy*:

> So we're never going to not look if somebody has some noncore assets for sale. But you've got to recognize why are they for sale, and we have—we've set some standards in terms of Kirkland Lake Gold. Minimum production levels has to be over 100,000 ounces, it has to be meaningful level. I might even say more than 100,000 ounces but it's got to be meaningful level of production. Talk about cash cost of $650 an ounce or under you can get from that asset; and all-in sustaining cost of $950 an ounce or under. I mentioned that those two numbers are important because you can't let the cash cost get too high because you have to have money available to invest in new equipment, to invest in infrastructure, to invest in exploration—in sustainable exploration to maintain the business. So, that's important to

us. And we need to see that. As we need to stay at $950 because we have to have a minimum return and minimum risk on the company and if we talk about a 15% hurdle rate, then we're kind of good to $1.050 gold.

ADD21 (cleaned up) (the "Minimum Standards Statement").

"Replying to an analyst's question about M&A" on February 21, 2019, Makuch said:

Going forward, I mean, we still see some significant growth and we talk about going to [a] million ounces this year. So that's the number one driver of our growth instead of going out and trying to buy that kind of company. ... We want to continue to grow with development of our own assets and organically ... .

ADD15 (cleaned up); *see* ADD14 (quoting similar statement) (together, the "M&A Statements").

But these statements were false. Discovery shows that at the time Makuch made these statements, Kirkland was targeting *several* poorly performing gold mines that did not meet Makuch's expressed standards. *See* Doc.69-4 (summary of Kirkland's 2019 acquisition targets). The truth was revealed only when Kirkland announced on November 25, 2019, that it had acquired a poorly performing company—Detour—causing a nearly 18% drop in Kirkland's stock price. Plaintiff's expert, Dr. Feinstein,

6

conducted an event study and found no other cause for the statistically significant drop. Doc.69-1, at 117; *see also* Doc.107-1.

Defendants did not set forth any direct evidence to dispute Dr. Feinstein's event study. Indeed, their own economic expert did not dispute Dr. Feinstein's finding or criticize his analysis. *Compare* Doc.91-4. Nor did she conduct a price impact assessment of her own or assess whether nonfraud factors might have contributed to the decline. Doc.107-2, at 101:21-102:12; *see also* Doc.107-1¶¶45-49.

## II.  LEGAL BACKGROUND

"To recover damages" under the Securities Exchange Act of 1934 and its implementing regulations, "a private plaintiff must prove, among other things, a material misrepresentation or omission by the defendant and the plaintiff's reliance on that misrepresentation or omission." *Goldman*, 594 U.S. at 118.

In *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court held that securities fraud plaintiffs can establish class-wide reliance on a misstatement by invoking "a rebuttable presumption of reliance based on the fraud-on-the-market theory," which "is premised on the theory that investors rely on the market price of a company's security, which in

an efficient market incorporates all of the company's public misrepresentations." *Goldman*, 594 U.S. at 117-18. Defendants can rebut the presumption by proving, by a preponderance of the evidence, that the allegedly misleading misstatements had *no* impact on the share price. *See id.* at 126.

In *Goldman*, the Supreme Court noted that in an inflation-maintenance case (a case in which a misleading statement is alleged to have *maintained* inflation in a stock price, rather than *created* it), courts should be attentive to the potential for a "mismatch between the contents of the misrepresentation and the corrective disclosure," which "may occur when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')." 594 U.S. at 123.

As this Court has explained, however, "*Goldman*'s mismatch framework requires careful trekking." *Goldman IV*, 77 F.4th at 81. Courts may not deny class certification simply because they believe the underlying claims lack merit. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 474-80 (2013). Accordingly, "district courts must analyze the price impact issue without drawing what might appear to be

8

obvious conclusions for off-limits merits questions such as materiality." *Goldman IV*, 77 F.4th at 81. "Not easy stuff." *Id.* at 105.

## III. PROCEDURAL HISTORY

### A. Motion to Dismiss

At the motion to dismiss stage, the District Court considered the Minimum Standards Statement and M&A Statements together and held that Plaintiff sufficiently pleaded that Defendants "materially misled investors by not disclosing its potential acquisition of Detour" or "a company *like Detour*." ADD29 (emphasis added).

Makuch's public comments "on certain minimum, objective standards—like all-in sustaining costs—for any asset that Kirkland would acquire .... falsely contradicted what the company's present intentions were: Detour did not meet Makuch's expressed standards for an asset, yet Kirkland was actively considering acquiring Detour at the time of Makuch's statements." ADD29. The court rightly rejected Defendants' "alternative interpretations" as "elid[ing] both how the veracity of statements is measured in this context and the duty Makuch may have had to disclose Kirkland's active consideration of an acquisition." ADD30. "Makuch's comments on standards for acquisition,"

9

the court reasoned, "could reasonably be understood to bar the acquisition of Detour—a company whose mine did not meet these standards." ADD30-31.

"That Makuch never ruled out acquisitions in his comments about minimum standards and the company's preference for organic growth also does not undermine" Plaintiff's claims, the court continued, because he "did not stay silent on acquisitions." ADD7. "Makuch instead broached the topic of acquisitions yet failed to speak truthfully and completely— he downplayed acquisitions as an approach for the company to grow and failed to disclose that Kirkland was actively considering an acquisition." *Ibid.* (cleaned up). "So, it is a 'question for the trier of fact' whether his nondisclosure was materially misleading." *Ibid.* (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)) (cleaned up); *see also* ADD32 (Plaintiff also met heightened pleading burden for alleging *scienter* because Makuch "allegedly knew" or "should have known" his statements "can reasonably be understood to further contribute to a then-known falsehood—that Kirkland would not consider acquiring a company *like Detour*" (emphasis added)).

## B.    Class Certification

At the class certification stage, the District Court did not consider the three statements about acquisitions together, as it had at the motion to dismiss stage. Instead, the court analyzed the Minimum Standards Statement in isolation from the M&A Statements, over Plaintiff's objection, and held that Defendants had proven by a preponderance of the evidence that neither influenced Kirkland's stock price.

*Minimum Standards Statement*. The District Court began by acknowledging that there was no gap in genericness between the Minimum Standards Statement and its corrective disclosure, so the stringent *Goldman IV* analysis was "inappropriate." *See* ADD21. Even so, the court concluded that it could decide whether there was a "substantive" mismatch and, in the process, resolve the parties' factual dispute over whether the alleged misstatement was false. ADD22.

"The *weight* of the evidence," the court found, "supports Defendants' interpretation" of the Minimum Standards Statement as "refer[ring] to future targets, rather than rigid requirements at the time of acquisition." ADD22-23 (emphasis added). On that view of the evidence, the statements were not false and thus there was a "substantive mismatch

11

between the alleged misrepresentation and the corrective disclosure," which, the court held, "'severed the link between back-end price drop and front-end misrepresentation.'" ADD24 (quoting *Goldman IV*, 77 F.4th 104) (cleaned up).

*M&A Statements*. As to the M&A Statements, the District Court recognized they were not nearly as generic as "the Supreme Court's prototype" in *Goldman* or "more platitudinous statements at issue" in *Goldman IV*. ADD15. But it still applied the *Goldman IV* framework for analyzing price impact when "there is considerable gap in front-end–back-end genericness." *Cf.* 77 F.4th at 102.

The District Court therefore asked "whether a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price." ADD16 (quoting *Goldman IV*, 77 F.4th at 102). The court found "that the record does not support Plaintiff's initially pleaded theory that Kirkland was actively negotiating *with Detour* at the time of the three alleged misstatements in January and February 2019." *Ibid.* (emphasis added). Based on its determination that the statement was thus not false or misleading when made, because Kirkland was not pursuing Detour in particular at the time, the court believed "a truthful,

but equally generic, substitute for the M&A Statements would be: 'Although we are focused on delivering significant organic growth, we are also considering external growth through M&A." *Ibid.* The court concluded that Defendants had proven, "that [this] truthful, but equally generic, substitute for the M&A Statements would not have impacted the stock price." *Ibid.*

Accordingly, the District Court denied Plaintiff's motion for class certification. ADD24.

## STANDARD

This Court grants leave to appeal under Federal Rule of Civil Procedure 23(f) when the petitioner demonstrates (I) "that the certification order implicates a legal question about which there is a compelling need for immediate resolution," or (II) "that the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable." *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001).

## ARGUMENT

**I.** **THE DENIAL OF CERTIFICATION IMPLICATES LEGAL QUESTIONS ABOUT WHICH THERE IS A COMPELLING NEED FOR IMMEDIATE RESOLUTION.**

**A.** **The District Court Applied *Goldman IV*'s Considerable-Gap-in-Genericness Framework Despite Finding *No* Gap in Genericness Between the Minimum Standards Statement and the Corrective Disclosure.**

This case presents the important, recurring question of the proper scope of the price impact analysis when there is *no* substantial mismatch in genericness and, in particular, whether courts may decide whether an alleged misstatement is, in fact, false to determine whether there is a "substantive mismatch" between the alleged misstatement and the corrective disclosure.

In considering the Minimum Standards Statement, the District Court acknowledged that the alleged misstatement was "quite specific," ADD21, such that the case did not meet the criteria for a "searching price impact" review under *Goldman IV*. It nonetheless viewed itself authorized to decide whether the statements were, in fact, false—a class-wide merits question that would otherwise be reserved for trial and a jury, *see Amgen*, 568 U.S. at 465-70—as part of an inquiry into whether

14

there was "a *substantive* mismatch" between the Minimum Standards Statement and the corrective disclosure. ADD22 (emphasis added).

That holding is a substantial departure from *Goldman IV*, effectively engaging in an even *more* searching evaluation of the evidence than this Court authorizes, even when the criteria for an unusually searching inquiry have not been met. If that dramatic incursion on the jury's responsibility is to be allowed, it should be based on this Court's considered judgment.

In fact, it should not be allowed. The Supreme Court and this Court have made clear that while courts may consider *evidence* that also goes to "'materiality or any other merits issue,'" *Goldman IV*, 77 F.4th at 103 n.15 (quoting *Goldman*, 594 U.S. at 124), courts cannot find a lack of price impact simply because they believe that the statements are immaterial or untrue. The Supreme Court directed that courts must "consider[] the generic nature" of the alleged misrepresentations, because they "must take into account *all* record evidence relevant to price impact, regardless whether that *evidence* overlaps with materiality or any other merits issue." *Goldman*, 594 U.S. at 123-24 (second emphasis added). But the "generic nature" of the alleged misrepresentations *is* the overlapping

15

evidence the Court was talking about. And it did not disturb its previous holdings "that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified." *Amgen*, 568 U.S. at 475.

That is why this Court, on remand, explained that "class certification litigation following *Goldman* is likely to involve *evidence* that, at the summary judgment stage, might also be relevant to materiality." *Goldman IV*, 77 F.4th at 103 n.15 (emphasis added). Especially because there is competing record evidence on how to interpret the Minimum Standards Statement, it was improper to resolve the factual dispute of the meaning of the statement at the class certification stage.

## B. The District Court Applied *Goldman IV*'s Mismatch Framework to the M&A Statements.

Immediate review is also warranted to clarify what counts as a sufficiently generic statement to trigger the "searching price impact analysis" required under *Goldman IV*. Drawing the right line is important because the analysis of *Goldman IV* is a significant departure

from the ordinary price impact analysis and puts a heavy thumb on the scale against a finding of price impact.

As *Goldman IV* acknowledged, the searching price impact analysis comes very close to the line of assessing merits questions reserved for the jury and therefore must be limited to the extraordinary cases in which "there is a *considerable gap* in front-end-back-end genericness." 77 F.4th at 102 (emphasis added). The District Court rightly found the misstatements substantially less generic than the example the Supreme Court gave or those this Court considered in *Goldman IV*. ADD15; *see Goldman*, 594 U.S. at 123 ("mismatch .... may occur when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model')"); *Goldman IV*, 77 F.4th at 82 ("Integrity and honesty are at the heart of our business.").

For example, Makuch responded to a question from an analyst about potential *mergers and acquisitions* that "'we don't need to do that to grow,'" because "'we have the ability to grow by 275,000 ounces'" internally. ADD14. "'We have internal growth, and we're ... growing the company through diamond drill bit, through development, and through lowering unit cost and improvements.'" *Ibid.* He likewise represented

17

that *internal* growth was "'the number one driver of our growth instead of going out and trying to buy that kind of company.'" *See* ADD15. He then reiterated "'the diamond drill bit" business Kirkland was "'going to continue to grow.'" *Ibid.* "'We want to continue to grow with development of our own assets and organically.'" *Ibid.*

The District Court found a mismatch because even though the misstatements were much less generic than in *Goldman IV*, they were nonetheless "far more generic" than the detailed corrective disclosure. ADD15-16. In *Goldman IV*, however, this Court explained that the mismatch inquiry focuses on the "generic nature of the allege misrepresentation" because *that* is the source of the risk that the back-end reaction may not reflect inflation-maintenance by the front-end alleged misrepresentation. 77 F.4th at 102-03; *see also In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, at *15 (E.D.N.Y. Aug. 8, 2023) (*Goldman* "explicitly premised its conclusion on the generic nature of the initial disclosure"). Even when a front-end statement is quite specific, the back-end corrective disclosure will almost always be *more* specific. *Goldman IV*, 77 F.4th at 98. The need for a probing analysis arises from the prospect that the defendant's misstatement is *so generic* that there is

significant reason to believe investors would not rely on it, a hypothesis that is tested through the "searching price impact analysis." *Id.* at 102.

This Court forewarned that the mismatch framework is "complex" and that further elucidation of the "analytical approaches might be warranted in future cases." *Goldman IV*, 77 F.4th at 105; *see also ibid.* (noting "the difficult task of thinking about materiality but not ruling on it" is "[n]ot easy stuff," and that until the Supreme Court "revisit[s] the issue," this Court has "work to do"). These novel legal questions "compel immediate review" because the Court recognized in *Goldman IV* that they are "of fundamental importance to the development of the law of class actions." *See Sumitomo*, 262 F.3d at 140.

And they are "likely to escape effective review after entry of final judgment." *Sumitomo*, 262 F.3d at 140. This Court has long recognized that certification orders in securities cases implicating the *Basic* presumption are "'likely to escape effective review after entry of final judgment,'" because "'very few securities class actions are litigated to conclusion, so review of a novel and important legal issue concerning the scope of the *Basic* presumption may be possible only through the Rule 23(f) device." *See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 80 (2d Cir. 2004)

19

(quoting *Sumitomo*, 262 F.3d at 140; *West v. Prudential Sec., Inc.*, 282 F.3d 935, 937 (7th Cir. 2002)).

## II. FAILING TO GRANT THE PETITION WILL END THE CASE, AND THE DISTRICT COURT'S DECISION IS DEEPLY TROUBLING.

"[I]nterlocutory review is particularly appropriate" here because the certification order is the death knell of Plaintiff's case, and even if that were not true, granting the Rule 23(f) petition "promises to spare the parties and the district court the expense and burden of litigating the matter to final judgment only to have it inevitably reversed by this Court on appeal after final judgment." *Sumitomo*, 262 F.3d at 139 (quotation marks omitted).

*First,* it is practically infeasible for Plaintiff to continue this litigation as an individual suit given the extraordinary expense compared to the value of his personal damages claim. *Sumitomo*, 262 F.3d at 138 (Rule 23(f) appeal appropriate where certification sounds "death knell" because "the denial of certification makes the pursuit of individual claims prohibitively expensive").

*Second*, for the reasons given above, Plaintiff has made a "substantial showing" that the District Court's "decision is questionable,"

20

at the very least. *Sumitomo*, 262 F.3d at 138. The decision is wrong for other reasons as well.

To start, the District Court erred in siloing the Minimum Standards Statement and M&A Statements. In doing so, the court misconstrued the meaning of the M&A Statements.

As discussed above, Makuch established the minimum standards for any acquisition at the same time he also misled investors by communicating Kirkland's focus on internal, organic growth, downplaying the potential of relying on low-quality acquisitions to grow the business. Analysts understood these statements as linking the company's focus on organic growth to the minimum acquisition standards he articulated during the January 2019 Investor Day. Thus, news of the Detour acquisition was an equally corrective disclosure, with just as much specificity for the M&A Statements as the Minimum Standards Statement.

Plaintiff submitted evidence that *investors* considered the statements together and were misled in the precise manner Plaintiff argues—evidence the District Court failed to address. Commentary from analysts can help explain the "kind of information investors would rely

21

upon in making investor decisions—and therefore can serve as indirect evidence of price impact." *Goldman IV*, 77 F.4th at 104. Several analysts commenting on the January 2019 Investor Day linked the very M&A Statements about "organic growth" and Minimum Standards Statement that the District Court siloed.

> RBC reported:
>
> With M&A topical ... , Kirkland Lake reiterated its focus on organic growth and noted that any external opportunities would need to compete with robust internal opportunities. Management discussed requirements for new projects to provide the company with meaningful annual production (+100 Koz), deliver cash costs and sustaining costs below $650/oz and $950/oz, respectively, and provide a return of 15%. Given the scarcity of assets meeting these requirements ... , Kirkland appears focused on delivering shareholder value through organic opportunities.

Doc.106-6, at 1.

> Desjardins reported:
>
> M&A potential – never say never, but only if it meets criteria. ... The company indicated that it is primarily focused in Canada and Australia, and potential assets will need to meet its grade and cost criteria (total cash costs <US$650/oz and AISC <US$950/oz) for it to be interested. Management also highlighted the significant organic growth potential within the company, which precludes the need for immediate action.

Doc.106-5, at 1.

BMO Capital Markets reported:

With precious metals M&A activity picking up in recent months, the first questions revolved around potential acquisitions. CEO Tony Makuch reiterated that KL Gold remains focused on organic growth projects, but if the right asset came along at the right price, management would be interested in taking a look. The prospective external project would still have to meet the following criteria: greater than 100koz Au annual production, less than $650/oz Total Cash Costs, and less than $950/oz AISC.

Doc.106-9, at 1.

The District Court drove a wedge between the M&A Statements and Detour announcement by incorrectly reframing Plaintiff's case as alleging that Makuch had misled investors by swearing off acquisitions altogether. ADD15 ("[N]either statement specifically ruled out considering acquisitions in the future."). That has never been Plaintiff's theory of the case, as the court correctly recognized at the motion to dismiss stage. ADD31 ("That Makuch never ruled out acquisitions in his comments about minimum standards and the company's preference for organic growth also does not undermine [Plaintiff]'s colorable claim here."). The District Court erred in finding that an equally generic yet truthful replacement for the M&A Statements "would be: 'Although we

are focused on delivering significant organic growth, we are also considering external growth through M&A." ADD16.

It then compounded its error by finding that this "truthful, but equally generic, substitute for the M&A Statements would not have impacted the stock price"—particularly because it found that the "most probative evidence on this question comes from a June 2019 statement in which Kirkland announced that it had opened a 'Deal Room' and invited potential acquisition candidates and partners to submit information through an online portal." ADD16. Because Plaintiff has never claimed that Defendants swore off acquisitions altogether, it is unsurprising that a generic announcement that Kirkland was interested in considering potential acquisitions had no impact on the stock price. That was old news.

Indeed, the market expected the company to consider acquisitions—but only if the target met Makuch's stated criteria, as analysts contemporaneously reported. The market took the announcement of the Detour deal to reveal that those criteria were false. The District Court's alternative "equally generic substitute" for the challenged statement is thus incomplete because it omits those criteria.

24

Had Makuch instead made the truthful statement "we're focused on organic growth, but are also actively considering growing the company by acquiring low-grade/high-cost mines that will affect our low-cost/high-grade metrics," the stock would have declined just like it did when Kirkland announced the Detour deal. *See, e.g.*, Doc.106-6, at 1 (RBC reporting on Makuch's statement that "Given organic production growth, robust free cash flow, a first-class balance sheet, and upcoming catalysts, we reiterate our positive outlook for Kirkland Lake shares in 2019").

The statements are all about the same subject—Kirkland's approach to acquisitions. The "representations, *taken together and in context*, would have misled a reasonable investor." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) (quotation marks omitted) (emphasis added). It is only inappropriate to consider different public statements together when they touch on *unrelated* subjects and are "separately disseminated to shareholders in separate reports at separate times," as in *Goldman IV*, where "the statements d[id] not obviously compl[e]ment or implicate the same topics." 77 F.4th at 94. In this case, the Minimum Standards Statement and M&A Statements were all made to analysts and investors within a few weeks of each other, and

even the District Court understood that they all related to the same topic. *See* ADD14.

This evidence also shows why the District Court's interpretation of the statements was wrong.

As discussed, the parties disputed whether Makuch, in giving the Minimum Standards Statement on January 14, 2019, intended to express standards that an acquisition must meet at the time of acquisition or, as Defendants argued, over the whole life of the mine. At the motion to dismiss stage, the District Court correctly noted that the question is not whether the statement was literally true, but how it would be interpreted by a reasonable investor. ADD30.

The court noted that these analysts "referred to the Minimum Standards Statement," but it found that "none of them indicated that it factored into their valuation of Kirkland's stock." ADD23. That ignores that one of the *same analysts*, RBC (among others), expressly noted that Kirkland's low-cost/high-grade production metrics were the reason for its stock premium. Doc.106-6, at 1; *see also supra* pp.4-5. And it minimized analysts' reactions to the Detour announcement *expressly referring* to the dilution of those metrics as the reason for downgrading Kirkland.

Eight Capital reported that "yesterday's announcement surprised us, as KL CEO Tony Makuch had continually stressed the company's low-cost profile as one of its main selling points." Doc.106-10, at 1. Canaccord called the deal a "head scratcher" and downgraded its rating and lowered its price target for Kirkland from C$67 to C$55, explaining that it had decreased its price multiplier from 1.5x to 1.0x P/NAV given the "increased cost profile that Detour will add to Kirkland's typically stable, high margin operations." Doc.106-12, at 1. Bloomberg also called the deal a "head scratcher," while CIBC "lowered KL CN to neutral from outperform and lowered PT to C$60 from C$73," explaining that "the deal was unexpected, as it takes KL CN current focus in high-grade underground mines to a lower grade open-pit deposit." Doc.69-20, at 1; *see* Doc.106-11, at 1. Investors on Seeking Alpha lamented that while "[m]any investors likely realized that an acquisition by Kirkland Lake Gold was inevitable ... I don't think that Detour Gold was on the top of anyone's list," given that the transaction "will likely take away the company's premium it enjoyed for its industry-leading cost profile." Doc.106-13, at 1-2.

27

This evidence dooms the District Court's finding that Defendants had proven *zero* price impact. Even if other aspects of the Detour deal may have caused *some* of the decline, Defendants have not established that the alleged misstatements did *no* work to prop up Kirkland's premium. In holding otherwise, the District Court prematurely conducted a loss-causation analysis the Supreme Court has long held is inappropriate for resolution at the class certification stage. *See Amgen*, 568 U.S. at 475.

## CONCLUSION

This Court should grant the petition and set the case for briefing and argument.

Dated: April 12, 2024                    Respectfully submitted,

                                         */s/ Daniel Woofter*

Christian Levis                          Daniel Woofter
LOWEY DANNENBERG P.C.                     Kevin K. Russell
44 South Broadway                        GOLDSTEIN, RUSSELL &
White Plains, NY 10601                      WOOFTER LLC
(914) 997-0500                           1701 Pennsylvania Ave. NW
                                         Suite 200
                                         Washington, DC 20006
                                         (202) 240-8433

*Attorneys for Plaintiff-Petitioner*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 5(c) because this document contains 5,166 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Office 365 Word in 14-point New Century Schoolbook LT Standard font.

Dated: April 12, 2024          _____/s/ Daniel Woofter_____
                                              Daniel Woofter

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I caused the above document to be electronically filed with the Clerk of Court of the U.S. Court of Appeals for the Second Circuit. I certify that in addition, I caused true and accurate copies of the forgoing petition and accompanying documents to be served by e-mail, as well as by FedEx, upon the Court and following counsel:

Audra S. Soloway
Joshua Hill Jr.
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
Email: asoloway@paulweiss.com

*Attorneys for Defendants-Respondents*.

Dated: April 12, 2024         */s/ Daniel Woofter*

                             Daniel Woofter

# ADDENDUM

# TABLE OF CONTENTS

March 29, 2024 Opinion and Order Denying Plaintiff's Motion
for Class Certification........................................................................ADD1

September 30, 2021 Opinion and Order Granting in Part and
Denying in Part Defendants' Motion to Dismiss...........................ADD25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: KIRKLAND LAKE GOLD LTD.
SECURITIES LITIGATION

20-CV-4953 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Stephen Brahms, individually and on behalf of all others similarly situated, brings this suit against Kirkland Lake Gold Ltd., a Canadian company that mines and processes gold, Kirkland's CEO, and the former chairman of Kirkland's board of directors (together, "Defendants" or "Kirkland"), for violations of Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240.10b-5. Plaintiff has moved for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3), as well as to exclude the testimony and report of one of Defendants' proposed experts. For the reasons that follow, Plaintiff's amended class certification and *Daubert* motions are denied.

## I. Background

The Court assumes familiarity with the factual and procedural history, as set forth in its September 2021 Opinion and Order. *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-CV-4953, 2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) (ECF No. 36). As relevant here, the Court granted Defendants' motion to dismiss with respect to all claims except those based on Kirkland CEO Anthony Makuch's statements about acquisitions. *Id.* at *6 (ECF No. 26 at 14). Plaintiff filed a motion for class certification on January 31, 2023 (ECF No. 66) and an amended class certification motion on March 6, 2023 (ECF No. 76). On March 30, 2023, Defendants filed their opposition. (ECF No. 88; ECF No. 89.) Plaintiff filed a reply memorandum on May 22, 2023.

(ECF No. 104; ECF No. 105.)  The same day, Plaintiff also filed a motion to exclude the testimony and report of defense expert James Griffin.  (ECF No. 108.)  On June 5, 2023, Defendants filed their opposition to Plaintiff's *Daubert* motion (ECF No. 115; ECF No. 116), and Plaintiff filed his reply memorandum on June 12, 2023 (ECF No. 121; ECF No. 122).  On October 5, 2023, the Court held oral argument on the amended motion for class certification and the *Daubert* motion.  (ECF No. 146.)

## II.  Motion to Exclude

The Court first addresses Plaintiff's motion to exclude the testimony and expert report of James Griffin.  Plaintiff seeks to exclude Griffin's testimony and report on the grounds that Griffin is unqualified and that his testimony is irrelevant and unreliable.  (ECF No. 109 at 6-15.)

### A.  Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that an expert who is "qualified . . . by knowledge, skill, experience, training, or education may testify" if the testimony would be helpful to the trier of fact, is "based on sufficient facts or data," and is "the product of reliable principles and methods," reliably applied to the facts of the case.  Fed. R. Evid. 702.  And these factors, in turn, largely have their origins in *Daubert*, in which the Supreme Court held that the district court bears a critical gatekeeping function in assessing the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-95 (1993).  "The district court has broad discretion to carry out [its] gatekeeping function.  Its inquiry is necessarily a 'flexible one,' and the types of factors that are appropriate to consider will 'depend[] upon the particular circumstances of the particular case at issue.'"  *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (first quoting *Daubert*, 509 U.S. at 594, and then quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The Second Circuit has "distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018); *see Nimely v. City of New York,* 414 F.3d 381, 396-97 (2d Cir. 2005).

Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," it has "offered limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *see also Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018) ("[T]he Second Circuit has not resolved whether and to what extent *Daubert* applies at the class certification stage."); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 28-29 (S.D.N.Y. 2020). "[C]ourts in the Second Circuit regularly 'subject expert testimony to *Daubert'*s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.'" *Bowling v. Johnson & Johnson*, No. 17-CV-3982, 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016)).

Accordingly, the Court here applies a *Daubert* analysis to the extent that Plaintiff seeks to exclude testimony relevant to the pending class certification motion. However, "the 'scope of the *Daubert* analysis is cabined by its purpose at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23.'" *Bowling*, 2019

WL 1760162, at *7 (quoting *Chen-Oster v. Goldman Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015)); *see In re LIBOR*, 299 F. Supp. 3d at 471 ("The question is not whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met." (quoting *Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013))); *cf. In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker.").

Defendants offer James Griffin as "a mining industry expert" to opine on "whether Defendants have shown a lack of price impact for the alleged misstatements at the heart of the case." (ECF No. 115 at 6.) Specifically, Griffin offers three expert opinions. First, Griffin opines that because "[m]ining is a self-depleting business model," both organic growth and mergers and acquisitions (M&A) are "complementary" and irreplaceable strategies for "a company's growth potential." (ECF No. 91-1 ¶ 17(a).) Industry observers and practitioners, therefore, would expect gold mining companies to be "generally on the lookout for M&A opportunities as they arise." (*Id.*) Second, Griffin offers the opinion that if the financial market understood Makuch's January 25 and February 22, 2019 statements "to mean that Kirkland would no longer consider any potential M&A opportunities, [he] would not have expected a positive price impact on Kirkland's stock price as a result of these statements." (*Id.* ¶ 17(b).) Third, Griffin opines that if the market understood Makuch's January 14, 2019 statement "to reflect that Kirkland had set certain minimum standards that must be met for Kirkland to

4

ADD4

consider a potential acquisition, based on [his] experience and expertise, [he] would not have expected a positive impact on Kirkland's stock price as a result of this statement." (*Id.* ¶ 17(c).)

Plaintiff moves to exclude Griffin's expert report on the grounds (1) that Griffin is not qualified to render an expert opinion, (2) that Griffin's testimony is irrelevant, and (3) that Griffin's opinions are unreliable. (ECF No. 109 at 6-15.) In his filings, Plaintiff focuses his attacks on the second and third of Griffin's opinions. Because Plaintiff offers the same arguments to justify the exclusion of both opinions, the Court addresses the admissibility of Griffin's opinions together rather than separately.

## B. Discussion

### 1. Qualifications

The Court begins with the first step of the Rule 702 inquiry: whether Griffin is qualified as an expert. To answer this question, the Court must first "examine the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702—knowledge, skill, experience, training, or education—with respect to a relevant field." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). "[A]ny one of these five forms of qualifications will satisfy the rule." *Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007). "[A] lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004). Second, courts must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004), and ensure that the expert will actually be testifying "on issues or subject matter within his or her area of expertise," *Haimdas v. Haimdas,* No. 09-CV-2034, 2010 WL

652823, at *2 (E.D.N.Y. Feb. 22, 2010) (citing *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir. 1997)).

Defendants offer Griffin as a mining industry expert based on his degree in mining engineering and his over 40 years of experience in the mining industry, including executive and consultancy roles. He has also worked over 25 years as an investment banker, advising gold and other mining companies on M&A. Plaintiff attacks Griffin's qualifications by arguing that his experience is primarily in coal mining and that he lacks experience specifically in gold mining. Plaintiff further argues that Griffin also lacks the expertise to opine on stock price movements, comparing him unfavorably to Plaintiff's own economics expert, Dr. Steven Feinstein, who holds a Ph.D. in economics and works on issues of market efficiency and price impact.

Based on the totality of his background, the Court determines that Griffin is qualified as a mining industry expert. Griffin is not being offered as an economics expert, and Defendants have offered a separate economics expert to rebut Feinstein's report. Instead, Defendants offer Griffin to opine on how gold mining industry observers and participants would have interpreted Makuch's statements. Plaintiff's critique also understates Griffin's gold mining experience: Griffin has worked on M&A issues related to gold and has worked for gold mining clients. The observation that Griffin's experience has been focused on the coal mining industry, and not primarily on the gold industry, goes, at most, to the weight rather than admissibility of his testimony. The Court, therefore, concludes that Griffin is qualified based on the totality of his education, knowledge, and experience.

The Court also determines that Griffin's background qualifies him to opine on how financial markets would have interpreted Makuch's statements. Griffin is not offering a quantitative analysis of price impact or stock price movements, which is covered by the parties'

dueling economics experts.  Instead, relying on his industry experience, Griffin opines on how investors would have broadly reacted to Kirkland's statements.  Griffin's decades of experience working on M&A related to mining, including gold mining, sufficiently qualify him to testify as an expert on how the reaction of industry observers, analysts, and investors to Kirkland's statements would have broadly affected the stock price.  The Court understands the scope of Griffin's expertise and would be capable of weighing his opinions accordingly for the purposes of the class certification motion.

### 2.   Reliability

The Court now turns to the second step of the Rule 702 inquiry: whether Griffin's report has a sufficiently reliable foundation.  "In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).  In *Daubert*, the Supreme Court set forth a list of non-exclusive factors for courts to apply to the reliability inquiry:

> (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-594) (internal citations and quotation marks omitted).  These factors, however, "do *not* constitute a definitive checklist." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999).  Rather, "the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

Plaintiff argues that Griffin's opinions are not reliable because they are merely statements of subjective belief and speculation, without any objective standards or supporting data. Plaintiff further contends that Griffin did not reliably apply his methodology to the case and that his opinions are based on only generalities about the mining industry as a whole rather than an assessment of the facts of the case. These arguments are unavailing.

First, Plaintiff appears to be applying reliability requirements for scientific or technical testimony rather than experiential testimony, which is subject a less rigid standard. *See, e.g., Gabel v. Richard Spears Kibbe & Orbe, LLP*, No. 07-CV-11031, 2009 WL 1856631, at *4 (S.D.N.Y. June 26, 2009) (observing that "testimony from the realm of a person's professional experience . . . does not readily lend itself to the *Daubert* framework does not render it inadmissible"). "Where, as here, an expert's opinion is based on the expert's experience, courts focus on the relationship between the experience and the opinion and whether the latter is rationally related to the former." *Mahoney v. JJ Weiser & Co.*, No. 04-CV-2592, 2007 WL 3143710, at *5 (S.D.N.Y. Oct. 25, 2007). In this case, the Court determines that there is a rational relationship between Griffin's decades of mining industry experience and his opinions, which concern industry custom, practices, and perceptions.

Second, contrary to Plaintiff's argument that Griffin's conclusions are purely speculative and subjective, Griffin has set forth a logical chain of reasoning that supports his opinions. Griffin opines that industry practitioners and observers have expectations that a gold mining company would pursue M&A opportunities because of the "self-depleting business model" of the industry. (ECF No. 91-1 ¶ 17(a).) Griffin's second and third opinions are logical

conclusions from this starting premise and Griffin's understanding of how investors would react when their expectations are frustrated.  (*See id.* ¶¶ 17(a)-(b).)  The Court understands that Griffin's opinions are based upon his practical experience working on M&A issues in the industry, and not a data-driven financial model, and would be capable of weighing his opinions accordingly.  Finally, Griffin's opinions are sufficiently grounded in the facts of the case—specifically, an analysis of Kirkland's business strategy and historic reliance on M&A for growth.  (*See id.* ¶¶ 56-61, 69.)  Accordingly, the Court concludes that Griffin's opinions have a sufficiently reliable foundation under Rule 702.

### 3.    Relevance and Assistance to the Trier of Fact

The Court now addresses the final step of the Rule 702 inquiry: whether the expert testimony will assist the trier of fact.  This inquiry "goes primarily to relevance."  *Daubert*, 509 U.S. at 591.  The Second Circuit has instructed "trial court[s] [to] look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant."  *Amorgianos*, 303 F.3d at 265. Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.

Plaintiff argues that Griffin's opinions are irrelevant because Griffin did not perform an event study or other quantitative analysis of Kirkland's share price movements.  Plaintiff thus contends that Griffin's opinions do not make the fact at issue—whether Makuch's statements affected the stock price—more or less likely.  Once again, Plaintiff's arguments go to weight rather than admissibility.  As already discussed above, Defendants offer Griffin as a mining industry expert, not an economics expert.  The relevance of Griffin's experience-based report is two-fold.  First, Griffin's opinions would assist the Court's understanding of how Makuch's statements fit into the customary practices of the mining industry.  Second, the opinions would

aid the Court in understanding how financial markets would have practically interpreted and reacted to the statements at issue. Accordingly, the Court concludes that Griffin's opinions are relevant to the evaluation of Plaintiff's price impact theory.

Because all of Plaintiff's objections to Griffin's expert report at most go to weight and not admissibility, the motion to exclude is denied.

## III.   Motion for Class Certification

### A.   Legal Standard

To obtain certification of a class pursuant to Rule 23(b)(3), a plaintiff must satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). Fed. R. Civ. P. 23(a). A plaintiff must also meet two additional showings: "predominance, *i.e.*, law or fact questions common to the class predominate over questions affecting individual members, and superiority, *i.e.*, class action is superior to other methods." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006) (citing Fed. R. Civ. P. 23(b)(3)). The party seeking class certification must "affirmatively demonstrate" compliance with each of those requirements "through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal citation and quotation marks omitted).

### B.   Discussion

To certify a class, the Court must conduct a "rigorous analysis" to determine that Rule 23's requirements have been satisfied. *Comcast Corp.*, 569 U.S. at 33 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). Here, that includes Rule 23(b)(3)'s requirement of predominance, which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

The Court's analysis begins and ends with the issue of predominance. "Because the Court concludes that Plaintiffs have not adequately demonstrated predominance, it need not

address the other [Rule 23] requirements." *Hunter v. Time Warner Cable Inc.*, No. 15-CV-6445, 2019 WL 3812063, at *9 (S.D.N.Y. Aug. 14, 2019).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action," which in a private securities-fraud claim includes "reliance upon the misrepresentation or omission." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011).  In *Basic v. Levinson*, 485 U.S. 224 (1988), the Supreme Court recognized that plaintiffs in securities fraud class actions can establish a class-wide presumption that investors relied on any misrepresentations reflected in a security's market price.  As the Second Circuit recently summarized in *Arkansas Teachers Retirement System v. Goldman Sachs Group, Inc. (ATRS),* 77 F.4th 74 (2d Cir. 2023):

> The *Basic* presumption excuses classes of securities fraud plaintiffs from proving that each class member individually relied upon a defendant's alleged misrepresentations.  Courts can instead presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock.

*Id*. at 80.

The *Basic* presumption of class-wide reliance is rebuttable.  "[D]efendants can rebut the presumption and defeat class certification by demonstrating, by a preponderance of the evidence, that the misrepresentations did not actually affect, or impact, the market price of the stock." *Id*. Therefore, while a plaintiff's "satisfaction of *Basic*'s prerequisites serves as an 'indirect proxy' for a showing of price impact," *id*. at 86 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278-81 (2014)), "an indirect proxy should not preclude . . . a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply," *Halliburton*, 573 U.S. at 281-82.  Here, Defendants do not dispute Plaintiff's satisfaction of *Basic*'s prerequisites

and instead seek to rebut the *Basic* presumption of reliance by offering evidence that the alleged misrepresentations did not impact Kirkland's stock price.

A threshold question for the Court is determining Plaintiff's theory of price impact. Plaintiffs can either plead a price-inflation theory—alleging that a misrepresentation inflated the stock price—or an inflation-maintenance theory—alleging that a misrepresentation maintained inflation already built into the stock price. *ATRS*, 77 F.4th at 80. Here, it is undisputed that none of the three alleged misrepresentations caused a statistically significant increase in Kirkland's stock price, and Plaintiff offers arguments premised on an inflation-maintenance theory. (*See* ECF No. 88 at 23, 26; ECF No. 105 at 13-16.) Furthermore, Plaintiff's expert submissions make clear that Plaintiff is proceeding with an inflation-maintenance theory. (*See* ECF No. 107-1.) Accordingly, the Court analyzes this case under an inflation-maintenance framework.

In an inflation-maintenance scenario, "the misrepresentation prevents preexisting inflation in a stock price from dissipating, but does not cause a price uptick. Instead, the back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price. Simply put, the theory goes: back-end price drop equals front-end inflation." *ATRS*, 77 F.4th at 80. As the Supreme Court recently observed, however, the "inference . . . that the back-end price drop equals front-end inflation . . . starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 594 U.S. at 123.

Accordingly, courts must undertake a mismatch inquiry in price-maintenance cases to determine "whether there is a basis to infer that the back-end price equals front-end inflation." *ATRS*, 77 F.4th at 99 n.11. This inquiry requires "a closer fit (even if not precise) between the

front- and back-end statements" than courts have required when analyzing the loss causation element of securities fraud. *Id*. "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 594 U.S. at 122 (internal citation and quotation marks omitted).

One way, but the not the only way, there could be a mismatch is in situations "when the earlier misrepresentation is generic (*e.g.,* 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.,* 'our fourth quarter earnings did not meet expectations')." *Id*. at 123. "Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id*.

The Second Circuit recently provided guidance on how courts should conduct "a searching price impact analysis" in the specific scenario where (1) "there is a considerable gap" in genericness between the earlier statement and the subsequent disclosure, (2) the corrective disclosure does not directly refer to the alleged misstatement, and (3) the plaintiff claims the earlier generic statement was misleading by omission. *ATRS*, 77 F.4th at 102. First, courts must determine how generic the alleged misrepresentations are and whether there is a gap in specificity between the corrective disclosures and the earlier statements. *Id.* at 93. Second, if there is a gap, courts must then "ask . . . whether a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price." *Id*. at 102 (citing *In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223 (2d Cir. 2016)). Because "the value of the back-end proxy, given the gap in specificity, will be diminished" in this scenario, "courts should consider other indirect evidence of price impact." *Id*. Based on this analysis, the court must ultimately

"find whether the defendants have demonstrated, by a preponderance of the evidence, that the alleged misstatements did not in fact impact the price of the stock." *Id*. at 103.

In its September 2021 Opinion and Order, the Court narrowed this case to three public remarks made by Makuch that allegedly misled investors about Kirkland's plans to acquire Detour, a Canadian gold mining company.  *Kirkland*, 2021 WL 4482151 at *6 (ECF No. 36 at 14).  These remarks comprise a January 25, 2019 statement and a February 21, 2019 statement regarding Kirkland's focus on organic growth (the "M&A Statements") (ECF No. 25 ("AC") ¶¶ 45, 53), as well as a January 14, 2019 statement describing the production levels and costs targets that Kirkland would apply in assessing a potential asset acquisition (the "Minimum Standards Statement") (*id*. ¶ 39).  The "corrective disclosure" to the three alleged misstatements was Kirkland's announcement on November 25, 2019, of its acquisition of Detour.  (*Id*. ¶ 68.)  Applying the inflation-maintenance framework for analyzing price impact, the Court first addresses the M&A Statements before turning to the Minimum Standards Statement.

### 1.    M&A Statements

Makuch made the first of the two M&A Statements at an institutional investor conference on January 25, 2019.  In response to a question from an analyst about potential M&A activity in 2019 to leverage Kirkland's share price, Makuch said:

> Well, I think, first off, you look at our organic growth strategy and what we're doing, I mean, we're where we have the ability to grow by 275,000 ounces. Currently, we're just the size of some mid-tier juniors.  There's a lot of companies talking about the noncore assets in those levels.  But we have it internally, we don't have to pay for it and we could finance it.  And then if I lead into [ ] what we think might be happening in 2023 onward, we still have some significant organic growth in the company.
>
> So, to do—to use our paper just to—for this to grow, we don't need to do that to grow. We have internal growth, and we're really financing our internal—we're growing the company through diamond drill bit, through development, and through lowering unit cost and improvements.

(AC ¶ 45.)  Makuch made the second M&A Statement in a February 21, 2019 earnings call.

Replying to an analyst's question about M&A, Makuch said:

> [G]oing forward, I mean, we still see some significant growth and we talk about
> going to million ounces this year . . .  So that's the number one driver of our
> growth instead of going out and trying to buy that kind of company.  We're going
> to continue to grow with the diamond drill bit.  We want to continue to grow with
> development of our own assets and organically, and then we're going to look
> seriously at how we give value back to our shareholders.

(*Id*. ¶ 53.)  The alleged "corrective disclosure" to these statements came in the form of

Kirkland's announcement on November 25, 2019 that it was acquiring Detour in an all-stock

deal valued at $3.68 billion.  Kirkland's share price declined 17% that day.  (*See id*. ¶¶ 6, 68.)

Applying the Second Circuit's recent guidance, the Court first addresses the "baseline

question: how generic are the alleged misrepresentations?"  *See ATRS*, 77 F.4th at 93.  Although

the M&A Statements may be more specific in character than the Supreme Court's prototype, *see*

*Goldman*, 594 U.S. at 123, or some of the more platitudinous statements at issue in *ATRS*, *see* 77

F.4th at 82, the Court nonetheless finds that the alleged misrepresentations are fairly broad and

generic statements about the company's growth strategy.  In the statements, Makuch broadly

discussed Kirkland's goals and focus, which prioritized organic growth over M&A activity:

"[T]hat's the number one driver of our growth instead of going out and trying to buy that kind of

company."  (AC ¶ 53.)  Looking out to 2023 and beyond, Makuch also forecast that "we still

have some significant organic growth in the company."  (*Id*. ¶ 45.)  Significantly, neither

statement specifically ruled out considering acquisitions in the future, and Makuch's statements

about Kirkland not needing M&A for growth did not go much beyond broad generalities.

Comparing the M&A Statements with the Detour acquisition announcement, the Court

finds a considerable gap in genericness between the earlier statements and the corrective

disclosure.  Makuch's broad statements about Kirkland's focus on internal growth are far more

generic than the announcement of a specific all-stock acquisition of a specific mine, with unique

characteristics, nine months later, at a particular valuation.  The Court also finds that the other

prerequisites to triggering the searching price analysis required by *ATRS* are satisfied: the Detour

announcement did not directly refer to the M&A Statements, and Plaintiff is effectively claiming

that the earlier statements were misleading by omission.  *See ATRS*, 77 F.4th at 102.

Accordingly, the Court proceeds with the next step of the analysis: asking "whether a

truthful—but equally generic—substitute for the alleged misrepresentation would have impacted

the stock price."  *Id*.  The Court finds that the record does not support Plaintiff's initially pleaded

theory that Kirkland was actively negotiating with Detour at the time of the three alleged

misstatements in January and February 2019.  Instead, the record evidence shows that although

Kirkland conducted diligence of Detour in late 2018, discussions between Kirkland and Detour

ended in 2018 and did not resume until the summer of 2019—months after the alleged

misstatements.  (*See* ECF No. 89 at 12-13.)  Therefore, a truthful, but equally generic, substitute

for the M&A Statements would be: "Although we are focused on delivering significant organic

growth, we are also considering external growth through M&A."

Having reviewed and considered all the evidence and expert submissions, the Court

concludes, by a preponderance of the evidence, that a truthful, but equally generic, substitute for

the M&A Statements would not have impacted the stock price.  Perhaps the most probative

evidence on this question comes from a June 2019 statement in which Kirkland announced that it

had opened a "Deal Room" and invited potential acquisition candidates and partners to submit

information through an online portal.  (*See* ECF No. 91-4 ¶¶ 53-54.)  The Deal Room

announcement is even more specific about Kirkland's openness to M&A activity than the

Court's substitute statement, and it is undisputed that the June 2019 statement did not cause a statistically significant decline in Kirkland's share price. (*See id.* ¶ 57; ECF No. 107-1 at ¶ 17.)

Evidence from contemporaneous analyst reports also supports the absence of price impact. "[M]arket commentary can provide insight into the kind of the information investors would rely upon in making investment decisions." *ATRS*, 77 F.4th at 104. Accordingly, the Court considers analyst statements to help determine whether the market relied upon the M&A Statements to infer that Kirkland was not pursuing M&A. The record shows that no analysts referenced or discussed either of the M&A Statements at all—let alone drew the inference that Kirkland was not considering acquisitions. (ECF No. 91-4 ¶¶ 48, 52.) In contrast, market commentary throughout the class period shows that multiple analysts reported on Kirkland's potential to pursue M&A, including noting specific factors that could drive the company toward acquisitions. (*Id.* ¶ 96 & n.155.)

The report of the defense expert, James Griffin, provides further support for the conclusion that the M&A Statements did not have a price impact. Drawing on his experience in the mining industry, Griffin observes that "[m]ining is a self-depleting business model." (ECF No. 91-1 at ¶ 17(a).) Simply put, "a mining company must replace the ore reserves it is extracting in order to simply maintain its production profile and future mine life." (*Id.*) And if a company wants to achieve long-growth growth, "it must also obtain control of incremental ore reserves through exploration and acquisitions." (*Id.*) Griffin states that organic growth and M&A are "complementary" strategies for mining companies, "and no single one can replace the other without hurting a company's growth potential." (*Id.*) On this basis, Griffin opines that "[a] statement by the CEO of a gold mining company that it would not consider M&A opportunities"—which is how Plaintiff interprets Makuch's statements—"would have signaled

to the market that the company was placing self-imposed restrictions on potential growth companies.  Therefore, I would not expect such a statement to have had a positive price impact." (*Id*. ¶ 17(b).)  Based on Griffin's extensive experience in mining and M&A, the Court credits Griffin's expert conclusions to the extent that he is opining on how market participants would have perceived and reacted to a statement that Kirkland was not considering M&A.

The defense's economics expert, Dr. Jennifer Marietta-Westberg, has also offered evidence supporting alternative explanations for the stock decline following the Detour announcement.  The academic literature shows that negative stock price reactions are associated with stock-financed deals—like the Detour acquisition—because the market interprets the use of stock as a signal that the acquiring company's stock was overvalued.  (ECF No. 91-4 ¶¶ 67-70.) Kirkland's shareholders also expressed concern that the Detour acquisition was a sign that Kirkland's flagship Fosterville mine was underperforming.  (*Id*. ¶¶ 72-75.)  Analysts also expressed concern that Kirkland, which focused on underground mines, lacked experience operating open-pit mines like Detour's.  (*Id*. ¶ 77.)  The Court acknowledges that Marietta-Westberg presented this analysis in her critique of the damages methodology offered by Plaintiff's expert and that she did not perform a quantitative analysis disaggregating the factors that caused the price decline.  Accordingly, the Court credits Marietta-Westberg's analysis to the extent that it offers credible, but potential, alternative explanations for the price decline.

Plaintiff's economics expert, Dr. Steven Feinstein, has offered his own report as well as a rebuttal to Marietta-Westberg.  (ECF No. 69-1; ECF No. 107-1.)  In his report, Feinstein determines that Kirkland's shares traded in an efficient market throughout the class period (ECF No. 69-1 ¶¶ 17-20)—a conclusion that Defendants do not dispute.  Feinstein also proposes a class-wide methodology for calculating the damages stemming from the alleged misstatements,

but the report itself does not calculate damages.  (*Id*. ¶¶ 154-165.)  Specifically on the question

of price impact, Feinstein argues that Marietta-Westberg's finding that Kirkland's stock price did

not experience a statistically significant decline after the June 2019 Deal Room announcement

should be given no weight in the Court's analysis because non-significance is "not proof of no

price impact."  (ECF No. 107-1 ¶ 17.)  Feinstein's contention fatally misunderstands the

analytical framework for inflation-maintenance cases.  It is true that, under an inflation-

maintenance theory, the alleged misrepresentations would not cause a statistically significant

increase in share price.  Because there are no visible price movements, courts have to seek out

indirect proxies for the alleged inflation.  That is why the Second Circuit has instructed courts, in

cases like this one, to ask "whether an equally generic, truthful substitute would have *dissipated*

inflation."  *ATRS*, 77 F.4th at 99 (emphasis added).  In this case, the June 2019 Deal Room

announcement is serving as the closest real-world proxy for the generic, but truthful, substitute

for the M&A Statements.  Under an inflation-maintenance theory, the June 2019 Deal Room

announcement would have dissipated the artificial inflation built into the share price.  The

undisputed finding that the June 2019 announcement was not followed by a statistically

significant decline in share price is, therefore, probative of the absence of price impact.

More generally, Feinstein opines that "the alleged misrepresentations may have

introduced artificial inflation into the stock price without moving the stock price when made."

(ECF No. 107-1 ¶ 56.)  That is a modest conclusion as far as it goes, as it simply restates the

theory of inflation maintenance.  Once again, it is precisely because inflation maintenance is not

directly measurable that courts have to resort to indirect proxies to assess price impact.

Even more crucially, Feinstein's price impact analysis is undermined by his factual

assumptions.  Feinstein opines: "Misrepresentations consistent with prior understandings and

expectations, and concealment of information consistent with those prior understandings and expectations[,] would generally not cause the stock price to move when made, but will cause inflation nonetheless by propping up the price of the stock." (*Id.* ¶ 51.) He further opines that "nonsignificant movement on the alleged misrepresentation dates is reasonably congruent with investors' prior understanding and expectations about Kirkland." (*Id.* ¶ 53.) Feinstein's confusion arises when he bases his understanding of Kirkland investors' prior expectations on the assumption that the factual allegations contained in the Complaint are completely true (*see id.* ¶¶ 66-71)—even those allegations that have subsequently been disproven. For example, Feinstein expressly relies upon Plaintiff's allegation that Kirkland "was actively considering acquiring Detour at the time of Makuch's statements" (*id.* ¶ 56), even though, as discussed above, the allegation of contemporaneous falsity is now contradicted by the record and has effectively been abandoned by Plaintiff. Feinstein cites the Court's September 2021 Opinion and Order for the proposition that "the Court determined that Plaintiff sufficiently pled that investors were misled by the Company's alleged misrepresentations and omissions" (*id.* ¶ 67)—without recognizing that the Court had to assume the truth of the allegations at the motion-to-dismiss stage. In effect, Feinstein's opinion on price impact is akin to this statement: "The available evidence is consistent with an inflation-maintenance theory, assuming Plaintiff's factual allegations are true, even those that may have disproven by the record." The Court, therefore, affords Feinstein's price impact opinion the modest credit that it is due.

Based on the weight of evidence and expert submissions, the Court finds that a truthful, but equally generic, substitute for the M&A Statements would not have impacted Kirkland's share price. Accordingly, Defendants have demonstrated, by a preponderance of the evidence,

that the two M&A Statements did not actually affect or impact the share price.  Defendants have

therefore rebutted the *Basic* presumption of reliance.

## 2.    Minimum Standards Statement

Makuch made the Minimum Standards Statement in a January 14, 2019 meeting with

analysts and investors:

> [S]o we're never going to [ ] not look if somebody has some noncore assets for
> sale.  But you've got to recognize why are they for sale, and we have—we've set
> some standards in terms of Kirkland Lake Gold.  Minimum production levels has
> to be over 100,000 ounces, it has to be meaningful level.  I might even say more
> than 100,000 ounces but it's got to be meaningful level of production.  Talk about
> cas[h] cost of $650 an ounce or under you can get from that asset; and all-in
> sustaining cost of $950 an ounce or under.  I mentioned that those two numbers
> are important because you can't let the cash cost get too high because you have to
> have money available to invest in new equipment, to invest in infrastructure, to
> invest in exploration—in sustainable exploration to maintain the business.  So,
> that's important to us.  And we need to see that.  As we need to stay at $950
> because we have to have a minimum return and minimum risk on the company
> and if we talk about a 15% hurdle rate, then we're kind of good to $1.050 gold.

(AC ¶ 39.)  As with the M&A Statements, the "corrective disclosure" was Kirkland's November

2019 announcement of the Detour acquisition.

Once again, the Court begins its analysis by assessing the genericness of the alleged

misstatement.  Compared with the two M&A Statements and the Supreme Court and Second

Circuit prototypes, the Minimum Standards Statements is quite specific.  In this statement,

Makuch announced specific numerical targets for production levels and costs for potential

acquisition targets.  Because the specificity of the Minimum Standards Statement allows for a

more direct, apples-to-apples comparison with the corrective disclosure, the Court determines

that the "truthful, but equally generic" inquiry is unnecessary and inappropriate for this

statement.  But that does not end the analysis, as a gap in specificity is not the only way there

could be a mismatch between the two statements.  Under Second Circuit precedent, the Court

must still undertake an inquiry comparing the two statements to determine "whether there is a basis to infer that the back-end price equals front-end inflation." *ATRS*, 77 F.4th at 99 n.11.

Based on a review of the record evidence, the Court determines that there is a substantive mismatch between the Minimum Standards Statement and the Detour acquisition announcement. The Court's analysis turns on a resolution of the parties' competing interpretations of the Minimum Standards Statement. Plaintiff contends that the statement announces specific performance targets—specifically, a cash cost of $650 per ounce or lower, an all-in sustaining cost of $950 per ounce or lower, and quarterly production of 100,000 ounces—for a mine *at the time of acquisition*. (*See* AC ¶¶ 39-40.) Defendants, meanwhile, interpret the performance targets as future metrics applying *over the life of the mine*. (ECF No. 88 at 12-13.) It is undisputed that Detour's all-in sustaining cost exceeded the minimum standard of $950 an ounce at the time of the acquisition, but it is also undisputed that Detour met all three performance metrics by the third quarter of 2021. (*See* ECF No. 91-4 ¶ 38.) The weight of the evidence supports Defendants' interpretation. In an earlier earnings call on October 31, 2018, Makuch discussed the same performance metrics for potential acquisitions:

> [O]ur goal . . . in terms of objective of what is a Kirkland lake asset, first off, it has to be a mine that has significant production . . . it needs to be a large production similar to what we may be getting annually currently at Macassa and/or Fosterville. And you have to see cash costs below $650 an ounce and all-in sustaining costs below $950 an ounce *over the life of [the] mine[.]*

(*Id*. ¶ 37) (emphasis added). In response to a follow-up question on the same call, Makuch repeated the cost metrics: "[M]aybe in a nutshell, I'd probably say—if I say $650 an ounce cash cost [and] $950 all-in sustaining [cost], it gives you a sense at a minimum of what we want to look for." (*Id*.) Defendants have also adduced evidence of other Kirkland statements from the class period that strongly suggest that the same three performance metrics were long-term goals

for acquisition targets.  (*Id*. ¶ 37 n. 49.)  This future-oriented interpretation is consistent with

Makuch's words in the M&A Statement that the cost metrics are what he would want to "get

from that asset."  (AC ¶ 39.)  As the Minimum Standards Statement referred to future targets,

rather than rigid requirements at the time of acquisition, there is a mismatch in content between

the statement and the corrective disclosure under Plaintiff's inflation-maintenance theory.

Because of this substantive mismatch, the "inference . . . that the back-end price drop equals

front-end inflation . . . starts to break down," *Goldman*, 594 U.S. at 123, and the court must

examine all probative evidence in assessing price impact, *see id*. at 122.

As with the M&A Statements, evidence from market commentary during the relevant

period supports the absence of price impact.  Three analysts who covered the January 14, 2019

investor day referred to the Minimum Standards Statement, but none of them indicated that it

factored into their valuation of Kirkland's stock.  (ECF No. 91-4 ¶ 42.)  Furthermore, no analyst

who covered the Detour acquisition referred back to the Minimum Standards Statements to state

that Detour's failure to meet those targets resulted in the decline in share price.  (*Id*.)  Although

analysts at the time did comment that Detour had higher costs than Kirkland, "commentary

touching upon only the same subject matter . . . cannot be enough."  *ATRS*, 77 F.4th at 74.

Griffin's expert report also supports the conclusion that the M&A Statement did not

impact the share price.  Griffin opines that if markets had understood the M&A Statement as

setting "certain minimum standards that must be met for Kirkland to consider a potential

acquisition, . . . [he] would not have expected a positive impact on Kirkland's stock price."

(ECF No. 91-1 ¶ 17(c).)  Griffin arrives at this conclusion because "[a] statement by the CEO of

a gold mining company that the company would only target already high-performing mines

would have signaled that Kirkland was limiting itself from pursing value-enhancing deals."  (*Id*.)

As with his opinions on the M&A Statements, the Court credits Griffin's conclusion to the extent he is opining based on his understanding of how markets would have reacted to such a statement. Meanwhile, for the reasons discussed in relation to the M&A Statements, the Court finds Feinstein's expert opinions to be of little probative value on the subject of price impact.

Based on the substantive mismatch between the alleged misrepresentation and the corrective disclosure, as well as the weight of the other probative evidence, the Court finds, by a preponderance of the evidence, that Defendants have "sever[ed] the link between back-end price drop and front-end misrepresentation." *ATRS*, 77 F.4th at 104. Accordingly, Defendants have successfully rebutted the *Basic* presumption of reliance on the M&A Statement.

Because Defendants have rebutted the *Basic* presumption of reliance on all three statements, Plaintiff has not adequately demonstrated predominance, as required by Rule 23(b)(3). Class certification is therefore denied.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion to exclude the testimony and report of defense expert James Griffin is DENIED, and Plaintiff's amended motion for class certification is DENIED.

The Clerk of Court is directed to close the motions at ECF Nos. 76 and 108.

SO ORDERED.

Dated: March 29, 2024
      New York, New York

_____
      J. PAUL OETKEN
      United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: KIRKLAND LAKE GOLD LTD.
SECURITIES LITIGATION

20-CV-4953 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Stephen Brahms, individually and on behalf of all others similarly situated,

brings this suit against Kirkland Lake Gold Ltd., a Canadian company that mines and processes

gold, Kirkland's CEO, and the former chairman of Kirkland's board of directors (together,

"Defendants" or "Kirkland"), for violations of Sections 10(b) of the Securities Exchange Act of

1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated under the

Exchange Act, 17 C.F.R. § 240.10b-5.  Brahms also alleges that Kirkland's chief executive

officer, Anthony Makuch, and the former chairman, Eric Sprott, violated Section 20(a) of the

Exchange Act as "controlling persons" of the company.  Defendants have moved to dismiss the

complaint for failure to state a claim.  For the reasons that follow, the motion is granted in part

and denied in part.

I.    **Background**

The following facts, drawn from the amended complaint, are presumed true for the

purposes of this motion. (*See* Dkt. No. 25 ("AC").)

Kirkland, a Canadian limited liability company headquartered in Toronto, owns and

operates gold mines in Canada and Australia.  (AC ¶ 2.)  Within the gold producing industry,

two of the most important measures of performance are how low a company's all-in sustaining

costs are (*i.e.*, how expensive it is to mine gold) and how high the average reserve grade of a

company's mines is (*i.e.*, how much gold is contained in the ore).  (AC ¶¶ 23–26.)  Kirkland had

established itself as a top leader among gold producers because of its performance on these two metrics — Kirkland's average all-in sustaining costs were half of the global average and the average reserve grade of its mines was nearly twenty times better than the global average during the 2019 fiscal year.  (AC ¶ 22.)

On November 25, 2019, "Kirkland announced that it had entered into a definitive agreement to acquire all outstanding securities of" Detour Gold Corporation (AC ¶ 68), a company that operated a single gold mine (AC ¶ 30).  Following this announcement, Kirkland's shares declined 17%.  (AC ¶ 68.)  Detour, unlike Kirkland, was an underperforming gold miner — Detour's all-in sustaining costs were twice the amount of Kirkland's, and Detour's reserve grade was nearly twenty-fold below Kirkland's.  (AC ¶ 4.)  As a result, Kirkland's acquisition of Detour would dilute Kirkland's performance on these two important metrics.  (AC ¶¶ 32, 69.)

In the wake of this acquisition, Brahms brought this action on behalf of those who bought or otherwise acquired Kirkland securities between January 8, 2019, and November 25, 2019, alleging that Defendants made material misrepresentations and omissions that artificially inflated Kirkland's shares.  (AC ¶ 86.)  Brahms alleges that Kirkland and Makuch made a series of statements and representations during the class period that misled the public to believe that Kirkland was not "planning to acquire another gold mining company, let alone one of Detour's characteristics." (AC ¶ 5.)  In reality, Kirkland was actively negotiating to acquire Detour (AC ¶ 33), and performing due diligence on the company during the class period (AC ¶ 59).  The alleged material misrepresentations and omissions Kirkland and Makuch made during the class period fall into five categories: (1) statements about acquisitions (*see* AC ¶¶ 39, 45, 53); statements about business strategy (*see* AC ¶¶ 33, 37, 49, 55, 57, 62, 64); statements about the company's ongoing operations and performance (*see* AC ¶¶ 37, 41, 42, 45, 52, 55, 56, 60, 63, 64,

66); statements about the company's internal controls and compliance with accounting standards (*see* AC ¶¶ 50, 51, 55); and statements projecting the company's future performance (*see* AC ¶¶ 37, 38, 44, 52, 58, 61, 65).

In response to Brahms's complaint, Defendants filed a motion to dismiss for failure to state a claim under Federal Rule of Procedure 12(b)(6).  (*See* Dkt. No. 29.)

## II.   Legal Standard

To overcome a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face*." Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Securities fraud claims, however, demand more: to survive a motion to dismiss, plaintiffs must satisfy "heightened pleading requirements."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  "[A] party must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  Similarly, the Private Securities Litigation Reform Act ("PSLRA") sets forth that when a plaintiff alleges securities fraud for an untrue statement or omission of a material fact, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see also Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (explaining similar requirements under Federal Rule of Civil Procedure 9(b)).  Moreover, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  § 78u-4(b)(2)(A).  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or

reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III.  Discussion

### A.  Statements About Acquisitions

The first set of allegations are three remarks Makuch publicly made about acquisitions that Brahms argues materially misled investors about Kirkland's plans to acquire Detour.  (*See* AC ¶¶ 39, 45, 53.)

#### 1.  Whether Nondisclosure of the Detour Acquisition Negotiations Was Materially Misleading

"There is no specific duty to disclose merger negotiations under SEC rules until they become definitive agreements." *Vladimir v. Bioenvision, Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009), *aff'd sub nom. Thesling v. Bioenvision, Inc.*, 374 F. App'x 141 (2d Cir. 2010). When a company speaks on an issue, however, "there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (cleaned up).  So, if a company publicly comments on mergers and acquisitions, it must "speak truthfully and completely." *Vladimir*, 606 F. Supp. 2d at 485.

In applying this conditional duty to disclose possible mergers and acquisitions, courts consider whether the nondisclosure was materially misleading.  A plaintiff's claim that a defendant company falsely denied ongoing merger discussions, for instance, should survive a motion to dismiss. *See In re Columbia Sec. Litig.*, 747 F. Supp. 237, 243 (S.D.N.Y. 1990). Similarly, when a plaintiff alleges that a company representative inaccurately denied evidence of a possible merger, that claim should survive a motion to dismiss. *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 281 (E.D.N.Y. 2000).  Even if a company does not make any direct comments relating to mergers and acquisitions, a plaintiff can still sufficiently plead that a

company was required to disclose a potential merger or acquisition.  *See, e.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("[W]hen a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration.").

Having reviewed the complaint, the Court concludes that Brahms has sufficiently pleaded facts supporting his contention that Kirkland materially misled investors by not disclosing its potential acquisition of Detour.  Makuch publicly commented on certain minimum, objective standards — like all-in sustaining costs — for any assets that Kirkland would acquire.  (Dkt. No. 25 ¶ 39.)  But he falsely contradicted what the company's present intentions were:  Detour did not meet Makuch's expressed standards for an asset, yet Kirkland was actively considering acquiring Detour at the time of Makuch's statements.  (AC ¶ 33.)  Brahms further argues that Kirkland misled investors because Makuch made statements about the company's plan for growth, which prioritized "organic growth" over acquisitions and rejected acquisitions as necessary for growth.  (Dkt. No. ¶¶ 45, 57.).  Notably, these statements about growth did not reject the possibility of Kirkland acquiring a company like Detour.  But Makuch did not simply discuss organic growth as, say, the company's "primary focus" while staying silent about a possible acquisition to fuel growth, which would not "not give rise to a duty to disclose potential [acquisition] negotiations."  *Vladimir*, 606 F. Supp. 2d at 490.  Makuch instead announced Kirkland's goal — growth — and explicitly downplayed acquisitions as an approach for this goal while Kirkland was actively considering an acquisition.  Publicly commenting on acquisitions may have created a duty to "speak truthfully and completely," *Vladimir*, 606 F. Supp. 2d at 485 — *i.e.*, to disclose that Kirkland was actively considering acquiring a company.  Whether

Makuch had this duty, given that he mentioned acquisitions while simultaneously minimizing it as an approach for Kirkland to grow, and whether his nondisclosure of a potential acquisition was materially misleading, are "questions for the trier of fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 268.

Kirkland's arguments to the contrary are unconvincing. Kirkland first contends that there is a "timing problem" because some of Makuch's statements concerning acquisitions happened during a break in Kirkland's acquisitions discussions with Detour. (Dkt. No. 30 at 8.) The flaw in this argument, as Brahms rightly points out, is that the Court may not consider Kirkland's asserted "facts" at the motion to dismiss stage. Brahms alleges that Makuch's statements were during active acquisition negotiations between Kirkland and Detour (AC ¶ 33); the Court must accept this as true, *see Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). Kirkland's other arguments offer alternative interpretations of Makuch's remarks: the minimum standards Makuch expressed for acquisitions referred to potential "asset purchase[s]," not the acquisition of another company (Dkt. No. 30 at 9); and Makuch's comments about Kirkland's growth only "expressed confidence" in organic growth but did not rule out acquisitions (Dkt. No. 30 at 9–10).

Yet Kirkland, in offering these alternative interpretations of Makuch's remarks, elides both how the veracity of statements is measured in this context and the duty Makuch may have had to disclose Kirkland's active consideration of an acquisition. The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers . . . . Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (internal citations and quotations omitted). Makuch's comments on standards for acquisitions, even if

they strictly applied to the acquisition of individual assets and not whole companies, could reasonably be understood to bar the acquisition of Detour — a company whose mine did not meet these standards.  (*See* Dkt. No. 25 ¶ 30.)  That Makuch never ruled out acquisitions in his comments about minimum standards and the company's preference for organic growth also does not undermine Brahms's colorable claim here.  Had Makuch stayed silent on acquisitions and simply touted the company's potential for organic growth, he would have had no duty to disclose that Kirkland was actively considering an acquisition.  *See Vladimir*, 606 F. Supp. 2d at 490.  But Makuch did not stay silent on acquisitions.  Makuch instead broached the topic of acquisitions yet failed to speak "truthfully and completely," *Vladimir*, 606 F. Supp. 2d at 485 — he downplayed acquisitions as an approach for the company to grow and failed to disclose that Kirkland was actively considering an acquisition.  So, it is a "question[] for the trier of fact" whether his nondisclosure was materially misleading.  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 268.

## 2.    Scienter

Kirkland argues that, even if its nondisclosure of its potential Detour acquisition was materially misleading, this claim should be dismissed because Brahms failed to allege a strong inference of scienter.  Kirkland contends that none of Brahms's allegations suggest "that the Defendants knew they had a duty to disclose the Detour acquisition before a definitive agreement was signed," and that Brahms "provides no reason why Kirkland and its management would lie about the Detour acquisition."  (See Dkt. No. 30 at 11.)  It is correct that scienter can be sufficiently pleaded through "facts that suggest [that defendants] knew they had a duty to disclose" information they withheld, *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1213 (S.D.N.Y. 1996), or through alleging that defendants enjoyed concrete benefits "realized by . . . wrongful nondisclosures alleged," *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261,

270 (S.D.N.Y. 2009). But these approaches — alleging that a defendant knowingly ignored a duty to disclose or had a motive to not disclose — are not the only way to establish scienter. *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) ("To satisfy the scienter requirement, a plaintiff need not allege facts which show the defendants had a motive for committing fraud, so long as the plaintiff . . . adequately identifies circumstances indicating conscious behavior by the defendants.")

"In order to plead scienter adequately under the PSLRA, a plaintiff must plead 'with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(2)). One circumstance that gives rise "to a strong inference of the requisite scienter" is when the complaint "sufficiently alleges that the defendants . . . knew facts or had access to information suggesting that their public statements were not accurate." *Id.* at 199. Whether there is a strong inference of scienter is based on "the facts alleged, taken collectively" instead of "whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (2007).

Brahms's allegations, taken together, sufficiently support an inference of scienter for Kirkland's nondisclosure of its potential Detour acquisition. Brahms alleges that each of Makuch's public comments on acquisitions was made while Kirkland was in active discussions to acquire Detour. Kirkland does not dispute the allegation that Makuch "knew about the status of Kirkland's discussions with Detour." (Dkt. No. 34 at 8.) Thus, when Makuch publicly stated certain minimum standards for acquisitions that Detour itself did not meet, he allegedly knew — or should have known — that these minimum standards were inaccurate. Makuch's subsequent comments dismissing acquisitions as necessary for Kirkland's goal to grow, on their own, may

not give rise to a strong inference of scienter.  When taken together with Makuch's comments about minimum standards for acquisitions, however, these comments downplaying acquisition can reasonably be understood to further contribute to a then-known falsehood — that Kirkland would not consider acquiring a company like Detour.  *See Tellabs, Inc.*, 551 U.S. at 324 (holding that a complaint survives if "the inference of scienter [is] cogent and at least as compelling as any opposing inference one could draw from the facts alleged").

### B.    Statements About Business Strategy

The second set of allegations concerns statements Kirkland made about its business strategy.  Kirkland issued several statements about its strategy of growing low-cost, high-margin production.  (*See* AC ¶¶ 33, 37, 49, 55, 57, 62, 64.)  Brahms argues that these statements were misleading in light of Kirkland's decision to later acquire Detour.  Kirkland counters that these statements are non-actionable because they were not false when made, made no explicit promises, and did not foreclose a future acquisition of Detour.  The Court agrees with Kirkland's arguments.

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801 (2d Cir. 1996), is instructive.  The defendant company in that case made several statements about its marketing strategy to narrow prices between its premium and discount products by increasing the prices of the latter.  *Id.* at 805.  Some time later, however, the defendant reversed course and decreased the prices of its discount products.  *Id.*  Because the defendant, according to the plaintiffs, "had already made the decision, or was actively considering adopting a plan, to slash . . . prices" when it made statements about its strategy to increase prices, the plaintiffs argued that these prior statements were false.  *Id.* at 812.  The Second Circuit rejected this argument and found that these statements were not actionable:  The plaintiffs failed to allege any facts "demonstrating that during the class period [the defendant]

was doing anything but pursuing [its expressed] strategy . . . . Furthermore, there is no allegation

that [the defendant] made any statements or predictions foreclosing the possibility of adopting

alternative marketing strategies." *Id.*

Similarly, here, Brahms fails to allege that Kirkland did anything but pursue its strategy

of low-cost, high-margin production *before* acquiring Detour. Like the claim in *San Leandro*,

Brahms's claim that Kirkland was actively considering the acquisition of Detour when it issued

statements about its business strategy is insufficient to survive a motion to dismiss. Further,

none of the alleged statements about Kirkland's business strategy foreclosed the possibility of

acquiring Detour. All of the statements about business strategy in the complaint simply express

Kirkland's desire to grow its low-cost, high-margin production, as opposed to "promises to

maintain [a] policy in the future." *Id.* at 811. The only statement that comes close to foreclosing

the acquisition of Detour — a statement from Makuch about not putting lower-grade

mineralization into a mill — was phrased as what the company "want[ed]." (Dkt. No. 25 ¶ 62.)

"A single, vague statement such as the one [Brahms] rel[ies] on . . . cannot have led any

reasonable investor to conclude that [Kirkland] had committed itself to a particular [] strategy

and had foreclosed all alternatives." *San Leandro*, 75 F.3d at 805. The Court thus dismisses

claims based on these allegations.

### C.    Statements about Kirkland's Ongoing Operations and Performance

Brahms also alleges that Kirkland described its ongoing operations and performance on

key metrics in a materially misleading way. (*See* AC ¶¶ 37, 41, 42, 45, 52, 55, 56, 60, 63, 64,

66.) The statements supporting this allegation in the complaint include ones like: Kirkland

stating it was "anchored by two high-grade low-cost operations" (Dkt. No. ¶ 25); Kirkland

calling itself "one of the lowest cost producers" in the industry (Dkt. No. ¶ 41); and Kirkland

reporting current metrics of its all-in sustaining costs and the grade of its mineral reserves (Dkt.

No. ¶ 64).  Brahms, again, does not allege that any of these statements were false when Kirkland made them.  He instead alleges that Kirkland's acquisition of Detour, which purportedly changed the conditions of the company's operations and its performance on key metrics, somehow rendered Kirkland's contemporaneous descriptions of its operations and performance on key metrics before the acquisition misleading.  But "[s]uch allegations of 'fraud by hindsight' are insufficient to plead fraud."  *Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 690 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013).  Since Brahms offers no evidence these statements "were false at the time made," *San Leandro*, 75 F.3d at 812, these allegations are dismissed.

### D.  Statements about Kirkland's Internal Controls and Compliance with Accounting Standards

The complaint states that Kirkland lacked adequate internal controls over its financial reporting.  (*See* AC ¶¶ 50, 51, 55.)  Kirkland correctly notes that Brahms does not explain, in the complaint or in his briefing, how "Kirkland's financial controls were flawed; indeed, [Brahams] does not even impugn any of the financial results that Kirkland disclosed to investors."  (Dkt. No. 30 at 22.)  Because Brahms's "allegations of lack of controls is an insufficient conclusory assertion without any factual support," these allegations are also dismissed.  *La Pietra v. RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 443 (S.D.N.Y. 2010).

### E.  Statements Projecting Kirkland's Future Performance

Brahms contends that Kirkland misled investors with financial projections and guidance it issued because these projections did not account for the potential acquisition of Detour.  (*See* AC ¶¶ 37, 38, 44, 52, 58, 61, 65.)  Kirkland makes two independent arguments here:  (1) that Brahms does not allege that Kirkland's projections "rested on improper assumptions or data that would have rendered them false when made" (Dkt. No. 30 at 17–18); and (2) that Brahms's

claims are "barred by the PSLRA's safe harbor for forward-looking statements" (Dkt. No. 30 at 18–22). The Court agrees with Kirkland's first argument; because this first argument provides a sufficient basis to dismiss these allegations, the Court does not address Kirkland's second argument.

"Plaintiffs are not permitted . . . to proceed with allegations of 'fraud by hindsight,' in which statements are proven false on the basis of subsequent information." *In re Ferroglobe PLC Sec. Litig.*, No. 19 Civ. 629, 2020 WL 6585715, at *6 (S.D.N.Y. Nov. 10, 2020) (quoting *Novak*, 216 F.3d at 309). Yet this is exactly what Brahms's complaint does — it attacks Kirkland's various projections as "unrealistic" because of Kirkland's "*plans* to incorporate Detour into its operations." (Dkt. No. 25 ¶ 36) (emphasis added). The acquisition of Detour, according to Brahms, would "transform" Kirkland from an "ultra low-cost, high-grade producer"— what Kirkland projected it would be, both qualitatively and quantitatively — into a "higher-cost, lower grade producer." *Id.* In other words, Brahms alleges that Kirkland's acquisition of Detour retrospectively rendered Kirkland's earlier projections inaccurate. These allegations of "fraud by hindsight" cannot survive a motion to dismiss. Had Kirkland's plans to acquire Detour fallen through, for instance, the complaint provides no other basis for why Kirkland's projections are actionable. Without the complaint containing "specific facts that support the inference that defendants were *contemporaneously* aware of contradictory information" when they issued their projections, *Ferroglobe*, 2020 WL 6585715, at *6 (emphasis added), these allegations must be dismissed.

Brahms relies on a dubious distinction to argue that his allegations amount to more than "fraud by hindsight." He cabins allegations of fraud by hindsight to scenarios where projections do "not pan out because of an unforeseen circumstance." (Dkt. No. 33 at 16.) Because Kirkland

knew "at the time [it issued its projections] that the contemplated acquisition" of Detour would contradict its projections, Brahms asserts that these projections are actionable. *Id.* This argument misses the mark because, as Brahms recognizes, the acquisition of Detour was "*contemplated*" when Kirkland issued its financial projections, not finalized. Brahms essentially expected Kirkland to "have anticipated future events" and adjusted its projections accordingly. *Novak*, 216 F.3d at 309. But allegations that would have required Kirkland to be "clairvoyant . . . do not suffice to make out a claim of securities fraud." *Id.*

F. **Sprott's Individual Liability**

The last set of allegations concerns the purported individual liability of Sprott. Brahms contends that Sprott is liable for the false statements Kirkland made during the class period under a theory of scheme liability. (*See* Dkt. No. 33 at 25.) The Court concludes that this claim is not adequately pleaded to survive dismissal.

Scheme liability requires the "performance of an inherently deceptive act that is distinct from an alleged misstatement." *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). The alleged "scheme" here is that Kirkland, through material misstatements and omissions about its pending Detour acquisition, tricked investors into purchasing shares at artificially inflated prices. (Dkt. No. 25 ¶¶ 103–105.) Brahms cedes that Sprott was not the "maker" of any false statement for this alleged scheme (Dkt. No. 33 at 25), but he argues for the first time in his brief that Sprott is still culpable under scheme liability, *id.* Yet he points to no actions, let alone inherently deceptive ones, that Sprott took to advance the alleged scheme here. He merely offers that Sprott "remain[ed] silent" as Kirkland made false statements and "secretly acquired a substantial position in Detour." (Dkt. No. 33 at 25.) Mere silence falls short of the inherently deceptive act that scheme liability requires, especially since Brahms's complaint lacks "particularized allegations that he had any role in shaping [the] content" of Kirkland's alleged misstatements. *In*

*re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 576 n.14 (S.D.N.Y. 2014).  And Brahms fails to explain how Sprott "secretly" acquiring a position in Detour "affected the market for securities" for Kirkland, which scheme liability also requires.  *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19 Civ. 7536, 2021 WL 1199035, at *8 (S.D.N.Y. Mar. 30, 2021) (internal quotation marks omitted).  This claim therefore must be dismissed.[1]

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED as to Defendants' statements about business strategy, ongoing operations and performance, internal controls and compliance with accounting standards, and projections of future performance, and DENIED as to Makuch's statements about acquisitions (*see* AC ¶¶ 39, 45, 53).  The motion to dismiss the claims against Sprott is also GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 29.

SO ORDERED.

Dated:  September 30, 2021
        New York, New York

_____
                J. PAUL OETKEN
            United States District Judge

---

[1] The complaint also asserts a claim against Sprott under Section 20(a) of the Exchange Act as a "controlling person[]" at Kirkland.  (Dkt. No. 25 ¶ 111.)  Kirkland does not directly confront this claim in its briefing.  However, like scheme liability's requirement of "an inherently deceptive act," controlling-person liability requires "'that the controlling person was in some meaningful sense a culpable participant in the fraud perpetuated by the controlled person,'" *In re Philip Morris Int'l Inc. Sec. Litig.*, No. 18 Civ. 08049, 2021 WL 4135059, at *15 (S.D.N.Y. Sept. 10, 2021) (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).  Since Brahms fails to allege how Sprott was meaningfully culpable in this alleged fraud, this claim is also dismissed.

ADD38