No. 24-1030

# In the United States Court of Appeals for the Second Circuit

---

STEPHEN BRAHMS, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED, PETITIONER

*v.*

ANTHONY P. MAKUCH, KIRKLAND LAKE GOLD LTD.,
RESPONDENTS

---

*FROM AN ORDER DENYING CERTIFICATION OF A CLASS ENTERED ON MARCH 29,*
*2024 BY THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK*
*(NO. 1:20-CV-04953-JPO)*
*THE HONORABLE J. PAUL OETKEN*

---

**RESPONDENTS' OPPOSITION TO PETITIONER'S RULE 23(F) PEITITION**

---

AUDRA SOLOWAY
JOSHUA HILL JR.
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*

**CORPORATE DISCLOSURE STATEMENT**

Respondents are Kirkland Lake Gold Ltd. and Anthony Makuch.  Respondent Kirkland Lake Gold Ltd. was a corporation incorporated under the laws of the Province of Ontario, Canada, with its principal place of business in Toronto, Canada. Kirkland Lake Gold Ltd.'s shares were publicly traded on the Toronto Stock Exchange, the New York Stock Exchange, and the Australian Securities Exchange. On February 8, 2022, Kirkland Lake Gold Ltd. completed a court approved plan of arrangement with Agnico Eagle Mines Limited.  As a result of this transaction, Kirkland Lake Gold Ltd. became a fully owned subsidiary of Agnico Eagle Mines Limited.  Effective January 1, 2024, Agnico Eagle Mines Limited, Kirkland Lake Gold Ltd., and St. Andrew Goldfields Limited (a subsidiary of Kirkland Lake Gold Ltd.) amalgamated under the Province of Ontario, with the resulting corporation continuing to exist under the laws of the Province of Ontario, Canada, with its principal place of business in Toronto, Canada.  The amalgamated company continued as Agnico Eagle Mines Limited and remains listed on the Toronto Stock Exchange and the New York Stock Exchange. Agnico Eagle Mines Limited does not have a parent corporation, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iii

PRELIMINARY STATEMENT .............................................................1

FACTUAL BACKGROUND ..................................................................2

LEGAL STANDARD ............................................................................5

ARGUMENT .........................................................................................5

    A.    The District Court Order Does Not Implicate a Legal Question for Which There Is a Compelling Need for Immediate Resolution. ..............................................................................8

        1.    The M&A Statements ................................................8

        2.    The Minimum Standards Statement ........................14

    B.    The Petition Does Not Make a Substantial Showing That the District Court Order Is Questionable, or Otherwise Justifies Interlocutory Review. ......................................................17

CONCLUSION ...................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc.* v. *Conn. Ret. Plans and Trust Funds*,
   568 U.S. 455 (2013) ..................................................................6

*Ark. Teacher Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) ...............................................*passim*

*Basic Inc.* v. *Levinson*,
   485 U.S. 224 (1988) ..................................................................5

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 524 (S.D.N.Y. 2014) ..................................16

*Flaherty* v. *Filardi*,
   2007 WL 1827841 (S.D.N.Y. June 26, 2007) ......................16

*Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*,
   594 U.S. 113 (2021) .........................................................*passim*

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ..................................................................6

*Slayton* v. *Am. Exp. Co.*,
   604 F.3d 758 (2d Cir. 2010) ..................................................15

*Sumitomo Copper Litig.* v. *Credit Lyonnais Rouse, Ltd.*,
   262 F.3d 134 (2d Cir. 2001) ....................................................5

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ....................................................7

*Waggoner* v. *Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ......................................................7

**Statutes**

Fed. R. Civ. P. 23(f) .........................................................1, 5, 20

## PRELIMINARY STATEMENT

Leave to appeal under Federal Rule of Civil Procedure 23(f) is unwarranted and should be denied. The petition identifies no errors and no compelling legal issues on which this Court's immediate guidance is needed. The district court correctly concluded, after carefully applying the decisions in *Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*, 594 U.S. 113 (2021) ("*Goldman*"), and *Ark. Teacher Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023) ("*ATRS*"), that neither category of alleged misstatements had price impact. It appropriately stated the relevant legal standard, conducted the "matching" analysis described in those cases, weighed all of the evidence introduced by the parties, and concluded that—all evidence considered—the alleged misstatements did not affect the stock price. The district court did not abuse its discretion in so concluding.

The petition nevertheless identifies three issues that supposedly warrant this Court's review, (*see* Petition ("Pet.") 3), but none of the issues involves a legal question suitable for appellate review; instead, each issue raises an objection to the district court's fact-specific application of settled law. Moreover, the petition mischaracterizes the district court's actual findings and attempts to reframe petitioner's own fraud theory in an effort to manufacture a legal question for appellate review. Petitioner asks first whether a district court may "decide the merits" at the class certification stage, but it is well-settled that courts must ***not***

decide merits issues and that they **must** decide Rule 23 issues—even if the latter happen to overlap with the former. The district court did not violate this precept. Petitioner next asks whether some of the statements were "generic enough" to trigger application of *ATRS*, but petitioner does not refute that there was, in fact, a "mismatch" in specificity between the front-end and back-end statements, and that the district court was correct to consider that "mismatch" in conjunction with all other price-impact evidence. Determining precisely how "generic" an alleged misstatement is presents a factual question for the district court, not a legal issue that requires this Court's immediate attention. And petitioner's third question asks whether the district court erred by acknowledging petitioner's own flip-flop in his fraud theory when weighing the class-certification evidence, but that issue pertains solely to the specific factual context of this case (and, in any event, the district court's ultimate finding did not rest on this point).

None of these case-specific objections to the district court's careful opinion require this Court's immediate intervention, particularly when petitioner can appeal this ruling after final judgment, and particularly when the district court's careful decision was in any event correct. The petition should be denied.

## FACTUAL BACKGROUND

Following the motion to dismiss opinion ("MTD Opinion"), only three alleged misstatements remained at issue, all concerning aspects of the merger-and-

2

acquisition ("M&A") strategy of respondent Kirkland Lake Gold ("Kirkland"), a Canadian gold mining company, and made by its then-CEO Anthony Makuch, in January and February 2019. *See* ADD25. Petitioner alleges that these statements were revealed to be false when, nine months later, Kirkland announced its plan to acquire Detour Gold Corporation ("Detour"), an open-pit mine unlike Kirkland's current mines, in a stock-for-stock transaction.

**Minimum Standards Statement.** At the January 14, 2019, Investor Day, Makuch expressed his openness to M&A, saying "we're ***never going to [ ] not look if somebody has some noncore assets for sale***." Dkt. No. 25 ("AC") ¶ 39.[1] He then described so-called "minimum standards" for a mine's all-in sustaining costs ("AISC"),[2] and cash costs,[3] stating: "Talk about cas[h] cost of $650 an ounce or under ***you can get from that asset;*** and all in sustaining cost of $950 an ounce or under" (the "Minimum Standards Statement"). *Id.* Makuch explained that these targets help to de-risk future profit margins given anticipated fluctuation in gold prices. *Id.*

---

[1] Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

[2] AISC is a gold-mining metric measuring certain costs projected or encountered over a period of time.

[3] Cash costs is a component of AISC.

3

The MTD Opinion sustained this statement on falsity and scienter grounds, (ADD29, 32-33), on the basis that "Detour did not meet Makuch's expressed standards for an asset, yet Kirkland was actively considering acquiring Detour at the time" the statement was made. *See* ADD29-30 ("the Court must accept . . . as true" that Makuch spoke "during active acquisition negotiations between Kirkland and Detour").

**M&A Statements.** While the Minimum Standards Statement expressly contemplated potential M&A activity by Kirkland, petitioner paradoxically alleged that two other statements "denied any appetite for acquiring another company, assuring investors that Kirkland had sufficient capacity to grow organically." AC ¶ 53. Specifically, on January 25, 2019, Makuch described Kirkland's potential for organic growth, highlighting its ability to grow by 275,000 ounces of production, and said "we don't need to" do M&A just "to grow" given ongoing production and operational improvements. AC ¶ 45. Similarly, on February 21, 2019, Makuch described organic growth as "the number one driver of our growth" given projected annual internal growth to one million ounces, "instead of going out and trying to buy that kind of company" (together, the January 25, 2019 and February 21, 2019 statements are referred to as the "M&A Statements"). AC ¶ 53. Petitioner alleged that Makuch falsely conveyed "no present or future plans to engage in M&A activities in 2019." AC ¶ 47.

4

In the MTD Opinion, the district court found falsity and scienter adequately pleaded on the basis that Kirkland was in "active acquisition negotiations" with Detour at the time the statements were made. ADD30. While the M&A Statements "did not reject the possibility" of the Detour acquisition, they "explicitly downplayed acquisitions as an approach" while Kirkland was "actively considering" Detour. ADD29.

## LEGAL STANDARD

To obtain interlocutory review under Rule 23(f), petitioner must either establish that: (1) "the certification order implicates a legal question about which there is a compelling need for immediate resolution" or (2) "the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable." *Sumitomo Copper Litig*. v. *Credit Lyonnais Rouse, Ltd*., 262 F.3d 134, 139 (2d Cir. 2001). In addition, this Court has "unfettered discretion" to deny Rule 23(f) petitions, (*id*. at 138 (quoting Rule 23(f) committee notes)), and it has recognized that the "standards of Rule 23(f) will rarely be met." *Id.* at 140.

## ARGUMENT

This petition purports to present questions concerning respondents' rebuttal of "price impact," which defeats the presumption of reliance established by *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). It has long been settled law that defendants

5

"must be afforded an opportunity . . . to defeat the [*Basic*] presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock,"—*i.e.*, did not have "price impact." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*").

The law is also well-settled—as is undisputed here, (*see* Pet. 15)—that "[m]erits questions may be considered to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.* v. *Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013). In fact, "a district court may not use the overlap [between merits and class certification] to refuse to consider the evidence" at class certification. *Goldman*, 594 U.S. 113 at 122 n.2.

In *Goldman*, the Supreme Court addressed inflation-maintenance cases, which involve alleged misstatements that do not cause an observable increase in stock price, but allegedly cause the stock price "to *remain* inflated by preventing preexisting inflation from dissipating from the stock price." *Id.* at 119-20. In such cases, plaintiffs "typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* at 123. *Goldman* recognized that, where there is "a

mismatch between the contents of the misrepresentation and the corrective disclosure," the "inference" that "back-end price drop equals front-end inflation" starts to "break down." *Id.* *Goldman*'s directive was simple: to determine whether a back-end price drop can serve as a proxy for front-end inflation in inflation-maintenance cases, courts must evaluate "*all* probative evidence" of price impact, "qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 122.

On remand, the Second Circuit in *ATRS* elaborated on the "mismatch" analysis articulated in *Goldman*. *ATRS* looked to this Circuit's price-maintenance precedent from *Waggoner* v. *Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), and *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016), for guidance. Unlike *ATRS*, neither *Waggoner* nor *Vivendi* involved a gap in "genericness," and *ATRS* used these cases to illustrate how courts should assess statements along a range of generality to see whether the corrective disclosure had a "tight fit" or "directly rendered false" the alleged misstatements. *ATRS*, 77 F.4th at 97-98. *ATRS* then analyzed the particular statements there at issue, looking first at the business principles statements, which were described as "platitudes," and then the conflicts disclosure, which was "quite a bit more specific in form and focus." *Id.* at 93.

*ATRS* explained that whether a misstatement has inflation-maintaining capacity can be tested. Courts should ask whether a "truthful substitute" for the

alleged misstatement, constructed at the same level of generality, "would have impacted the stock price." *Id.* at 98-99, 103. Courts also should consider "all probative evidence" of price impact, *Goldman*, 594 U.S. at 122, such as expert testimony and analyst reports, to assess whether the statements "as written" had the capacity to "prop[] up" the stock price. *ATRS*, 77 F.4th at 101-02.

### A.     The District Court Order Does Not Implicate a Legal Question for Which There Is a Compelling Need for Immediate Resolution.

The district court found, based on the particular statements at issue and the evidentiary record, including expert evidence, that respondents successfully rebutted the *Basic* presumption. This decision does not present a legal issue as to which there is a compelling need for immediate resolution, as to either the M&A Statements or the Minimum Standards Statement.

### 1.     The M&A Statements

As instructed by *Goldman* and *ATRS*, the district court began its analysis by comparing the content of the front-end and back-end statements. It observed that, in the M&A Statements, Makuch "broadly discussed Kirkland's goals and focus, which prioritized organic growth over M&A activity." ADD15. The district court acknowledged that the statements were "more specific" than certain statements at issue in *Goldman,* but found that "neither ruled out considering acquisitions in the future" and they "did not go much beyond broad generalities." *Id.* The district court then compared the M&A Statements to the alleged corrective disclosure, and found

a "considerable gap" between these "broad statements about Kirkland's focus on internal growth" and the Detour acquisition news, which was the announcement "of a specific all-stock acquisition of a specific mine, with unique characteristics, nine months later, at a particular valuation." ADD15-16. Petitioner does not—and cannot—dispute that this comparative analysis between the back-end and front-end statements is required by *Goldman*. *See Goldman*, 594 U.S. at 123 (inference that "back-end price drop equals front-end inflation" starts to "break down" when there is a "mismatch between the contents").

The district court then continued the analysis by reviewing all other evidence of price impact—as *Goldman* and *ATRS* expressly require. Following *ATRS*'s guidance from the *Waggoner-Vivendi-Goldman* trio addressing price-maintenance cases, the district court assessed whether a truthful but equally generic substitute would have impacted the stock price. It correctly fashioned that substitute as: "Although we are focused on delivering significant organic growth, we are also considering external growth through M&A." ADD16-17. The district court then evaluated the significant evidence that such a statement would ***not*** have price impact. In particular, in June 2019, Kirkland issued an even more specific announcement inviting potential acquisition candidates to submit information to an online portal— and that announcement caused no stock decline. ADD17. Respondents had also introduced additional evidence that Kirkland repeatedly communicated its openness

9

to M&A, also undermining any inference that the M&A Statements were "propping up" artificial inflation in the stock.[4]

Finally, the district court examined the voluminous expert evidence demonstrating that the M&A Statements were not "propping up" the stock. That evidence included (1) the lack of analyst coverage of the M&A Statements (*i.e.*, zero analyst reports cited the statements); (2) analyst reports specifically commenting on Kirkland's openness to M&A; (3) respondents' mining expert's opinion that, because mines are inherently dissipating assets, the market would not have positively received a statement that Kirkland was closed off to M&A; and (4) respondents' economic expert's opinion that there were numerous non-fraud-related reasons for the stock decline (*e.g.*, the stock-for-stock deal structure, market concerns that the acquisition signaled underperformance at Kirkland's flagship mine, and market concerns that Kirkland lacked experience with Detour's open pit mines). *See* ADD16-18. On the other hand, after a lengthy discussion, the district court

---

[4] For example, Kirkland's SEC filings explained that "the Company examines opportunities to acquire additional mining assets and businesses" and that any such acquisition may "change the scale" of its operations and expose it to new "geographic, political, operating, financial, and geological risks." Dkt. No. 88 at 18. Makuch also repeatedly disclosed that Kirkland's M&A strategy involved "steal[ing] value" by identifying targets with untapped potential, with the goal of improving the target once acquired. *Id.* As Makuch explained, "you should never turn away from anything because you don't know [if] there's a ***hidden value*** there" and noted that Kirkland was "always going to be looking" to "***steal value***" from acquisition targets. *Id.*

determined that the opinion of petitioner's only expert deserved only "modest credit." ADD18-20. The petition identifies no error in the district court's analysis of this considerable evidence, which led it to conclude that respondents demonstrated by a preponderance of evidence that the M&A Statements did not actually impact the share price. ADD20-21.

According to petitioner, the district court erred because, though it found the M&A Statements to be "fairly broad and generic," (ADD15), it acknowledged that the M&A Statements were "less generic" than certain statements in *Goldman* and nevertheless conducted a "searching" analysis of price impact as described in *ATRS*. Pet. 3, 16-19. But a defendant is permitted to rebut price impact with "*all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue." *Goldman,* 594 U.S. at 122. The petition is simply wrong that "the need for a probing analysis" arises solely from the level of genericism of the statement—which no Court has ever held. Pet. 18-19. Indeed, neither *Waggoner* nor *Vivendi* involved "generic" statements akin to certain of the "platitudes" at issue in *ATRS*—but the *ATRS* court invoked the *Waggoner-Vivendi-Goldman* trio to explain how the price impact should be evaluated in a maintenance case.[5]

---

[5] In *Waggoner,* the alleged misstatement was that Barclays' trading platforms were "safe from aggressive trading practices" because the bank was "taking steps to protect institutional investors" by "monitoring and removing aggressive traders,"

It thus would have been clear error for the district court to disregard respondents' evidence, and not conduct the "searching review" about which the petition now complains. As such, even assuming the "mismatch" in specificity here was less severe than *Goldman*, that does not raise a compelling legal question worthy of review, particularly where, as here, the petition identifies no evidence that the district court impermissibly considered.

The petition also presents for review (as question 3) whether the district court erred by acknowledging petitioner's own shifting theory of the case, by finding that "the record does not support Plaintiff's initially pleaded theory that Kirkland was actively negotiating with Detour at the time of" the alleged misstatements, (ADD16), purportedly without acknowledging "record evidence" that Kirkland was "courting" other mines. Pet. 3. The petition ignores the idiosyncratic context in which the district court noted that petitioner's pleaded theory was unsupported. It was petitioner who—in the face of zero evidence that Kirkland was in active negotiations with Detour in January/February 2019, and after receipt of a Rule 11 letter from

---

and the correction disclosed that "no special protections existed" and "Barclays favored rather than removed aggressive traders." *ATRS*, 77 F.4th at 97. In *Vivendi,* the company made a series of statements about its "comfortable liquidity situation" that were later contradicted by reports that the company "faced massive refinancing needs." *Id.* at 98.

respondents, (Dkt. No. 91-20)[6] —proffered a new theory during class certification, arguing that Kirkland was instead considering *other* mining companies, not Detour. *See* Dkt. No. 88 at 12-16. The district court acknowledged petitioner's shift in theory, both when it considered how to fashion the truthful substitute for the alleged misstatement, (ADD16), and in evaluating the credibility of petitioner's expert. *See* ADD20 (discussing how petitioner's economic expert assumed as true facts that petitioner himself "abandoned"). Ironically, petitioner now attempts to create error by the district court simply for acknowledging his own flip-flop in theory—even though the petition cites no evidence about the new theory that the district judge improperly ignored. This case-specific argument creates no legal issue worthy for interlocutory review.

In sum, the petition does not come close to showing that the district court's denial of certification as to the M&A Statements presents a compelling legal issue in need of immediate resolution. Interlocutory review would not resolve any novel

---

[6] Following receipt of this letter, rather than seeking leave to amend his complaint, petitioner filed a motion for class certification that abandoned this pleaded theory and provided an alternate theory: Kirkland was "actively pursuing" a "secret strategy" to acquire and turn around supposedly "failing mining businesses" *other* than Detour. Dkt. No. 68 at 2. Respondents argued at class certification that the district court should not consider this unpleaded theory, (*see* Dkt. No. 88 at 16-17), but the district court did not address this argument, and apparently gave petitioner the benefit of considering it.

or difficult legal issue and would not contribute to the development of the law of the Circuit.

## 2. The Minimum Standards Statement

Turning to the Minimum Standards Statement, the district court correctly began by assessing the statement itself—again just as *Goldman* and *ATRS* require. Given the specificity of the statement, the district court determined that a "direct, apples-to-apples comparison with the corrective disclosure" was possible. ADD21. The district court then analyzed the plain meaning of the statement, and the context given by other public statements, and concluded that there was a complete "mismatch" between the front-end statement and the back-end corrective disclosure. ADD21-23. Specifically, because the front-end statement was plainly forward-looking, and spoke to performance metrics that were "long-term goals" that all parties agreed Detour satisfied, there was a "substantive mismatch" with the alleged corrective disclosure, which significantly undermined the inference that the back-end drop is a proxy for front-end inflation. ADD23. This is precisely the type of inquiry that the *Goldman* and *ATRS* courts direct. *See, e.g.*, *Goldman*, 594 U.S. at 123 (explaining that a "mismatch between the contents of the misrepresentation and the corrective disclosure" means that there is "less reason to infer front-end price inflation . . . from [a] back-end price drop"); *ATRS*, 77 F.4th at 99 n.11 (holding that "in light of *Goldman*," the price-maintenance mismatch inquiry requires "a closer fit

14

(even if not precise) between the front- and back-end statements" than a merits loss causation analysis).

Petitioner argues that by undertaking this "substantive mismatch" analysis, the district court decided the "merits question" of falsity rather than price impact. Pet. 14-15. That is incorrect. The district court simply ascertained whether the Minimum Standards Statement was forward-looking, based on the plain meaning of the statement (*e.g.,* Makuch's words "that you can get from that asset") and numerous other public statements where Makuch used forward-looking language when describing the same targets (*e.g.,* "over the life of [the] mine"). *See* ADD22-23. While not addressed in the MTD Opinion here, district courts routinely address, as a matter of law, whether statements are forward-looking in nature—such an exercise falls comfortably within the province of the court. *Slayton* v. *Am. Exp. Co.*, 604 F.3d 758, 765-67 (2d Cir. 2010). Then, finding the Minimum Standards Statement forward-looking, the district court correctly observed that "it is also undisputed that Detour met all three performance metrics by the third quarter of 2021." ADD22. In other words, petitioner conceded that, if the targets were forward-looking, the Detour acquisition met the targets. Because the back-end Detour announcement thus did not contradict the front-end statement, the district court found "a mismatch in content between the statement and the corrective disclosure." ADD23. Thus, the district court did not decide the statement's falsity

at all.  It was petitioner who **conceded** that Detour did meet the targets on a forward-looking basis, and the assessment that the statement was forward-looking was necessary to assess the "mismatch."  It is irrelevant that the evidence about the statement's falsity "overlap[s]" with the evidence necessary to assess the mismatch, because courts "must use [such] evidence to decide the price impact issue"—just as the "generic" nature of the statements in *Goldman* were relevant both to materiality and to the price-impact analysis.  *Goldman*, 594 U.S. at 122-23 & n.2.

At most, the petition presents a case-specific objection to the manner in which the district court weighed the evidence, but "such fact-specific issues are, of course, inappropriate for interlocutory appeal."  *Flaherty* v. *Filardi*, 2007 WL 1827841, at *2 (S.D.N.Y. June 26, 2007); *see also In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 533, 536-37 (S.D.N.Y. 2014).

Moreover, the petition's narrow focus on the mismatch analysis overlooks that the district court's order rested on numerous other factors.  Finding the inference of back-end-front-end equivalence undermined, the district court proceeded to analyze *all* economic evidence offered by both petitioner and respondents.  ADD22-24; *see ATRS*, 77 F.4th at 102-105.  Specifically, the district court reviewed the following evidence and found that each supported the absence of price impact:  (1) three analysts had cited the Minimum Standards Statement, but none factored it into their valuation of Kirkland's stock; (2) in analyst commentary following the Detour

acquisition announcement, no analyst harkened back to the Minimum Standards Statement to comment that Kirkland had not met its own standards; and (3) evidence from respondents' mining expert that the Minimum Standards Statement (even as interpreted by petitioner) would not have been well-received by mining investors, and thus would not inflate the stock, because it would suggest that Kirkland was only targeting "already high-performing mines" and was "limiting itself from pursuing value-enhancing deals." *See* ADD23-24. By contrast, the district court found petitioner's expert opinion "of little probative value." ADD24. Taken together with the "mismatch," this evidence showed that "by a preponderance of the evidence . . . Defendants 'sever[ed] the link between back-end price drop and front-end misrepresentation." ADD24 (citing *ATRS*, 77 4th at 104).

These findings as to the Minimum Standards Statement therefore present no legal question that compels immediate interlocutory review.

**B.** **The Petition Does Not Make a Substantial Showing That the District Court Order Is Questionable, or Otherwise Justifies Interlocutory Review.**

Petitioner offers additional reasons why interlocutory review is warranted, but none suffices.

Petitioner has failed to make a substantial showing that the district court's decision is questionable. As discussed *supra*, the district court did not abuse its discretion in denying class certification. And petitioner's hodge-podge of additional

17

criticisms of the order are meritless, and certainly do not meet the standard for interlocutory review:

*First,* petitioner claims that the Minimum Standards Statement and the M&A Statements should be read together, and the district court erred in siloing the statements, because "investors considered the statements together." Pet. 21. Petitioner cites RBC, Desjardins, and BMO analyst reports to support his proposition that analysts "understood [the Minimum Standards and M&A] statements as linking the company's focus on organic growth to the minimum acquisition standards." *Id*. Nonsense. These three analyst reports are dated January 14-15, 2019—before the M&A Statements were even made on January 25 and February 21, 2019—and thus cannot possibly show that investors "linked" the not-yet-uttered M&A Statements with the Minimum Standards Statement. *ATRS,* 77 F.4th at 94 (addressing statements separately because they were "separately disseminated to shareholders in separate reports at separate times" and there was no evidence that investors "**conjunctively** consume[d] those statements") (emphasis in original).

Petitioner also criticizes the district court's separate analysis of the M&A Statements and the Minimum Standard Statement, arguing that the district court improperly reframed his case as alleging that Kirkland "misled investors by swearing off acquisitions altogether" which petitioner states "has never been [his] theory of the case." Pet. 23. To the contrary, the district court's understanding

18

comes straight from petitioner's own complaint, which claims that Makuch lied by "den[ying] any appetite for acquiring another company, assuring investors that Kirkland had sufficient capacity to grow organically." AC ¶ 53; *see also* AC ¶ 47 (alleging falsity because Makuch expressed "no present or future plans to engaged in M&A activities in 2019 and that it could grow organically without the need to acquire outside companies"). The district court surely did not err by adhering to petitioner's own pleaded allegations.

*Second,* petitioner attempts to show that certification decision is questionable because investors were surprised by the Detour acquisition. Petitioner claims that the market "took the announcement of the Detour deal" to mean that Kirkland's "minimum standards" for acquisitions were false (Pet. 24)—but, as the district court found, petitioner cannot identify a single analyst report that harkened back to the Minimum Standards Statement following the Detour acquisition announcement. ADD23.

Petitioner then cites a host of analyst reports that were also presented to the district court, but these reports only confirm the many non-fraud related, alternative reasons for the negative market reaction to the Detour acquisition, including Kirkland's lack of experience with open-pit mines like Detour and Detour's lower reserve grade. Pet. 26-27. Other cites discuss analyst commentary that Kirkland

19

traded at a premium given its high reserve grade[7] and low costs, but this evidence was also presented to the district court—as was respondents' evidence that this analyst commentary was either irrelevant to M&A strategy or irrelevant to the alleged false statements. The district court plainly reviewed the analyst commentary, (*see* ADD17, 23 (citing examples)), and it declined to endorse petitioner's evidence-based arguments. It is not even "questionable" whether that decision was an abuse of discretion, and the Rule 23(f) standard is not satisfied.

Finally, petitioner points to the expense and burden of continued litigation. *See* Pet. 20. But the petition neglects to mention that discovery is complete, and summary judgment has been fully briefed and is pending before Judge Oetken. If (as petitioner says) the district court's decision on class certification effectively resolves the merits, this Court will shortly have the benefit of a more complete record by allowing final judgment to be entered.

## CONCLUSION

For the foregoing reasons, the petition for leave to appeal pursuant to Federal Rule of Civil Procedure 23(f) should be denied.

---

[7] While the petition makes multiple references to purported statements and analyst coverage of reserve grade (Pet. 4, 25-27), reserve grade is a different metric from cash costs and AISC, and the district court dismissed the only statement about reserve grade. *See* Dkt. No. 88 at 15-16; ADD34-35.

Dated: April 22, 2024

Respectfully submitted,

/s/ *Audra J. Soloway*
Audra J. Soloway

Audra J. Soloway
Joshua Hill Jr.
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

***Counsel for Defendant-Respondents***

## CERTIFICATE OF COMPLIANCE

This Opposition to Petitioner's Rule 23(f) Petition complies with the type-volume limitation of Fed. R. App. 5(c) because the opposition contains 4,582 words, excluding the parts of the petition exempted by Fed. R. App. 32(f). This petition complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because the petition has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

APRIL 22, 2024                  */s/ Audra J. Soloway*

                                      AUDRA J. SOLOWAY